## BALTIMORE COUNTRY CLUB, INC. *v.*
## COMPTROLLER OF THE TREASURY

[No. 249, September Term, 1973.]

*Decided June 24, 1974.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*W. Hamilton Whiteford* and *John A. Hayden, III,* with whom were *Ascanio S. Boccuti* and *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellant.

*William J. Rubin, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

The Maryland Retail Sales Tax Act, Maryland Code (1969 Repl. Vol.) Art. 81, § 324 *et seq.*, provides in § 325 that " [f]or the privilege of selling certain. tangible personal property at retail ... a vendor shall collect from the purchaser a tax ... on the price of each separate retail sale made in this State . . . ." A "retail sale" is defined in § 324 (f) to include:

> "The sale of alcoholic beverages regardless of the place of consumption; and the sale of any meals, food or drink for human consumption on the premises where sold. . . ."

The Baltimore Country Club, Inc. (the Club) sells alcoholic beverages, meals, food and drink to its members and is concededly a "vendor" within the meaning of § 324 (b) making taxable "retail sales" to purchasers; accordingly, it is required to collect and pay to the Comptroller of the Treasury a sales tax on the total "price" of such sales. As defined in § 324 (i), the term "price" means:

> "the aggregate value in money of any thing or things paid or delivered, or promised to be paid or delivered by a purchaser to a vendor in the consummation and complete performance of a retail sale without any deduction therefrom on account of the cost of the property sold, cost of materials used, labor or service cost, or any other expense whatsoever. 'Price' shall not include the following:
>
> "(1) The consideration received for labor or services used in installing or applying the property sold if the consideration for such services is separately stated from the consideration received for the tangible personal property in the retail sale.
>
> * * * "

It has been the Club's policy for many years to add a 15% mandatory gratuity or "service charge" to its stated price for

food and beverages served to its members. The Comptroller considered that these "service charges," which the Club collected and paid over to its employees, constituted part of the "price" of the Club's retail sales; consequently, for the period from August 26, 1966 through August 25, 1970, the Comptroller levied a sales tax assessment against the Club for the amount of all such service charges totaling $15,919.18 (including interest and penalties). The Maryland Tax Court affirmed the Comptroller's action and the Club appealed.

The appeal comes before us on an agreed statement of facts (Maryland Rule 828 g) to this effect:

The Club is a private incorporated club which provides dining, recreational and other facilities for the use and benefit of its members. Members of the Club voluntarily associated themselves therewith by application, nomination by a then member of the Club, and payment of a membership fee. Thereafter, those wishing to continue their Club membership are periodically assessed for membership dues. The Club is governed under a Constitution and By-Laws which provide for the election by the whole membership of the Club of a governing body of twelve governors who each serve three year terms (the Board of Governors) and from whose ranks the officers are selected. Every policy of the Club is ultimately dependent upon the acquiescence of the membership and subject to a vote of the full membership of the Club.

The Club operates at two separate locations, one in Baltimore City and one in Baltimore County; each has a main dining room and several additional areas (bars, grills, lounges and private dining rooms) in which meals, food and drinks are served and consumed. In addition to the regularly scheduled times during which meals, food and drinks are sold to members at these facilities, the Club also offers facilities for and caters private parties or functions for members. In offering to sell meals, food and drink to its members, the Club assumes the responsibility for all matters related to the preparation and serving of such items. There are also sports facilities. Service personnel are employed by the Club in each of these areas, and those

employed where food is served fall into four categories: "Maitre d'," "Captains," "Waitresses," and "Busboys."

There is one Maitre d' whose duties include the supervision of all service personnel at both club locations. Under the Maitre d' are seven "Captains" who supervise employees in specific areas of the Club location in which they are serving on a particular day. Tasks for a captain also include taking of meal orders and insuring, to the best of his ability, the comfort and satisfaction of members and their guests using dining facilities. Waitresses perform the duties customarily assigned such personnel in commercial restaurants and busboys perform duties including removal of dishes between courses of a meal, refilling water glasses as appropriate and clearing tables.

Except on rare occasions, no cash is used for transactions in the Club's dining facilities. After each meal the Club member is presented with a chit upon which he subscribes his name. All chits signed during a month are consolidated and monthly statements are rendered to each member, listing all charges then owing and which the member is expected to pay within a reasonable time.

The bill or chit presented to a member after a meal lists only a charge for the menu price of the total of all food and drink served to the member and his guests. Upon that total there is computed the Maryland Sales Tax determined by the Club's office employees who apply the applicable sales tax rates to the total menu price as reflected on the chit signed by the member. As to the sales tax determined by this method, the Club concedes that it is responsible for its collection and payment, and that such sums have been collected by the Club and paid over to the Comptroller during the period in question.

After the computation of the total bill and the sales tax determined by the method set out heretofore, and during all times herein relevant, a sum equal to fifteen percent of the total of the menu price and sales tax was calculated and charged against the account of the member and billed to him as part of his monthly statement. No sales tax was either paid over to the Comptroller or collected by the Club as a

result of this charge against the accounts of the members, a charge characterized by the Club as a "service charge" or tip or gratuity not subject to any sales tax, and as a "mandatory charge" and a portion of the "price" by the Comptroller.

The present practice of calculating and including this separate amount on members' statements, hereinafter referred to for convenience as a "service charge," originated when during World War II, and for a short time thereafter, members determined to permit cash tipping as a means of retaining and obtaining help at a time when there were severe labor shortages, since such cash tipping provided more money for the employees. The membership of the Club became dissatisfied with this system which it felt resulted in abuses, primarily that very high payments made by some members resulted in their receiving attentive service and preferential treatment while other members were not accorded similar courtesy by service personnel.

In response to concern about the situation, the Board of Governors proposed and the members voted to abolish tipping. As a result of the vote, the following resolution was carried on March 29, 1950:

> RESOLVED: That the NO TIPPING rule be put into effect as of April 1, 1950, and that 10% be added to each member's house account each month, the proceeds derived therefrom to be for the exclusive benefit of the Club's Employees.

The employees of the Club were not consulted about, nor did they participate in, this change in policy. Some time thereafter the Board of Governors of the Club amended the 10% service charge to 15% and this percentage has been in effect for all times here pertinent.

Under the present service charge policy, the members of the Club are advised that the purchase of any food, drink or meals automatically and invariably will result in the inclusion of the additional 15% service charge. In addition, the giving of any cash gratuity to any employee by a member is strictly prohibited and violations will result in both the member and the employee being disciplined, up to

and including the possible expulsion of a member for chronic violations.

A member who avails himself of any of the facilities offered by the Club incurs a binding contractual obligation to the Club to pay the charges made therefor. This includes all charges made for meals, food and drink, and the service charges incident thereto. Club policy prohibits a member from withdrawing unless he has paid all outstanding bills to the Club, including service charges attributable to the sale of food and drink. The Club has, on several occasions, sued a member for non-payment of a bill for food and drink including the 15% service charge.

All members of the Club must agree in writing, upon admission to the Club, to be bound by its Constitution and By-Laws. Thus, the Club's policy in regard to so-called service charges, like all other Club policies, is binding upon all members of the Club, including those who voted against it or disagree with it.

The Club maintains a separate accounting ledger for the accounting of funds collected from service charges. Such funds are maintained in a single account with funds collected from other sources by the Club. Distribution of service charges to employees occurs biweekly and concurrent with their salary payment, and as a part of a single paycheck, except for employees who work at private parties and functions, who receive both their wages and share of service charges in cash immediately after the function. At all relevant times, the Club has had a balance (surplus) in its service charge account.

At all times here relevant 10% of the 15% service charge was distributed to the waitress who served the club member incurring the bill (66.6% of service charge). The Maitre d' received 1.5% of the service charge paid on account of all meals served at any club location (10% of total service charge). The remaining 3.5% (23.33% of total service charge) is allocated among the busboys and captains as determined by the Maitre d'. When a busboy or captain accepts employment with the Club, he is told by or negotiates with the Maitre d' for the receipt of a preset daily or weekly

payment of the service charges collected, in addition to his hourly, daily or weekly wages. Such payments are guaranteed by the Club, and are paid to the employees if they work, regardless of how much is collected by the Club as service charges. Thus, some payments of service charges are not necessarily related to either the amount of service charges personally generated by an employee or the total amount of service charges collected. In the event that there would not be enough money in the service charge account to pay such amounts guaranteed to employees, they would nonetheless be paid from other funds of the Club, and the Club would later reimburse itself from future amounts of service charges collected. All employees are entitled to and receive their share of the service charges whether or not the Club has collected or ever collects such amounts from a particular member. Although the Club has no regular policy relating thereto, in some cases it will pay a particular employee on vacation or sick leave extra amounts (in addition to salary) to compensate for his loss of gratuities.

At one time (prior to 1961) all employees who shared in the distribution of the service charges received a preset weekly amount, rather than a percentage of what they personally generated or of the whole amount collected. This method was later changed to the present method and the Club retains the sole authority to change the method of distribution of the service charges collected.

A portion of the service charges paid to employees is applied to satisfy the Club's obligation to pay the minimum wage required by law. The Club believes that the present system in effect results in better service to the members than any of the methods previously in effect, and that it also avoids the possibility of any animosity or ill feelings among the membership which might result from large voluntary tippers receiving better service than other members. (This concludes the agreed statement of facts.)

(1)

The Club contends on appeal, as it did below, that a sales tax should not be computed upon tips or gratuities paid to its

employees "through the Club acting as a conduit for such funds, pursuant to a written Club policy which establishes the method for the collection and computation of such tips or gratuities, and which do not inure to the benefit of the Club." To support its position, the Club relies upon the opinion of the District Court of Appeal of Florida in *Green v. Surf Club, Inc.*, 136 So. 2d 354 (1961), *cert. denied,* 139 So. 2d 694 (1962), a case holding on facts similar to those now before us that no tax was collectible under the 'Florida statute on service charges automatically added in lieu of a tip to the price of food and beverages sold by a private club to its members. The court there noted that the club received no benefit from the service charge; that it was "no more than an instrumentality or a conduit for the collection of gratuities or 'tips' for its waiters or service personnel," and that the club's employees had agreed to waive their right to receive gratuities from the patrons whom they served upon the express provision that the club would collect a fixed percentage of the gross sales price on food and beverage, and remit it to the employees as a part of their salary or wages, as a bonus.

The "determinative question," the Florida court stated, was whether the "dealer" received a benefit from the involuntary charge; that if he did, he should be taxed; that if he did not, no tax should be levied. 136 So. 2d at 356.

Taxability under the Maryland statute, unlike that in effect in Florida, in no way depends upon whether the vendor receives income from the sale, retains the amounts collected or receives any benefit therefrom; all that is required is that the amounts be paid in the consummation and complete performance of a "retail sale." *See Hooks v. Comptroller*, 265 Md. 380, 289 A. 2d 332 (1972); *Frank J. Klein & Sons, Inc. v. Comptroller*, 233 Md. 490, 197 A. 2d 243 (1964). We said in *Hooks* that the Maryland statute "does no more than impose a tax on the privilege of transferring certain property or providing certain services for a consideration at retail." 265 Md. at 388. The tax is imposed on the purchaser "upon the act of selling itself." *Comptroller v. Kaiser Aluminum & Chemical Corp.*, 223 Md. 384, 388-89,

164 A. 2d 886, 888 (1960). Otherwise stated, the tax is imposed "upon the occurrence of an event, a purchase." *Central Credit Union v. Comptroller,* 243 Md. 175, 183, 220 A. 2d 568, 572 (1966).

As shown by the agreed statement of facts in the present case, in making sales of food and beverages to its members, service is always provided by the Club as an integral part of the transaction. The mandatory service charge imposed by the Club as part of the sale is a legally binding contractual obligation upon the purchaser, one "automatically and invariably" levied and required to be paid as a constituent part of the "price" of the sale. Thus, in *Youngstown Club v. Porterfield,* 21 Ohio St. 2d 83, 255 N.E.2d 262 (1970), involving both facts and a sales tax statute virtually identical to that now before us, the Supreme Court of Ohio affirmed the imposition of a tax on a mandatory 15% service charge on all sales of food and drink made by a private club to its members. In holding the service charge to be a part of the "price" of such sales under a definition of that term identical to our own, the court said:

> "The Club is furnishing and serving food and drinks, and its billing to members includes the service charge. The fact that the service charge is somewhat segregated from the charge for food and drinks, and will eventually pass to the waiters, does not make the labor cost any different from the amount for fixed labor costs which are included in the price for food and drinks. In finding that these service charges should be included in the price of a sale, the board's action was neither unreasonable nor unlawful." 255 N.E.2d at 264.

*Compare St. Paul Hilton Hotel v. Commissioner of Taxation,* 214 N.W.2d 351 (Minn. 1974); *Memphis Country Club v. Tidwell,* 503 S.W.2d 919 (Tenn. 1973). In *Hooks v. Comptroller, supra,* we held that the taxable "price" of a rental of a taxicab included amounts contractually required to be paid by the purchaser to the vendor for gasoline, an item which would have been, by itself, exempt from tax.

Because the purchase of the gasoline was part of the consideration for the rental of the vehicle, we held that it was part of the "price" of the sale, as defined in § 324 (i), and as such subject to sales tax.

As heretofore indicated, the term "price" (§ 324 (i)) means "the aggregate value in money of any thing or things paid or delivered, or promised to be paid or delivered by a purchaser to a vendor in the consummation and complete performance of a retail sale *without any deduction therefrom on account of* the cost of the property sold, cost of materials used, *labor or service cost, or any other expense whatsoever.*" (Emphasis supplied.) In affirming the Comptroller's assessment, the Tax Court held that inasmuch as the exception from the definition of "price" contained in § 324 (i)(1) for "labor or services used in installing or applying the property sold" was inapplicable — a conclusion which the Club concedes was correct — the rule of statutory construction *expressio unius est exclusio alterius* [1] compelled the finding that all other charges for labor or service in a sale, including those here at issue, were part of the taxable "price" of the sale. We agree with the Tax Court and conclude that the mandatory 15% service charge was part of the "price" of the Club's retail sales of food and beverages and as such subject to sales tax.

### (2)

The Club maintains that the Tax Court erred in its determination "that the imposition of sales tax on amounts paid as a gratuity to service personnel by means other than direct cash payment was not unconstitutionally arbitrary and discriminatory where a similar tax is not imposed upon cash tips under the Comptroller's regulations." The Comptroller's Bulletin 68-3, addressed to "Caterers and all hotels which furnish banquet meals," specifies that sales tax must be paid on the full amount of the bill; that it be computed "on the cost of the meal plus all other service costs whether it be for personnel, such as bartenders and

---

1. Expression of one thing is the exclusion of another.

waitresses, or gratuities, . . . [but that] [w]hen an individual patron orders a meal and decides to give the waitress a cash tip in addition to the amount of the bill, such tip is not taxable as it is not a part of the price of the meal." The Club claims that the distinction is arbitrary and without rational relationship to a legitimate state purpose; it says that there is no difference in the service rendered in either instance, and that "[t]he placement of cash tips in a category not subject to sales tax while placing all other tips in a classification requiring the imposition of a sales tax is the result of the capricious determination by the Comptroller that the statutory definition of 'price', which includes 'the aggregate value in money . . . paid or delivered . . . by a purchaser to a vendor in the consummation and complete performance of a retail sale' somehow includes any sum controlled, even for an instant, by the employer."

In concluding that it was not unconstitutional to impose a sales tax on amounts paid by a lessee-driver of a cab for its rental while not taxing an owner-driver on the use of his own cab, we said in *Hooks v. Comptroller, supra,* at 388-89:

"The equal protection clause does not require absolute mathematical equality in regard to state taxation; '[r]ather, it permits great "flexibility and variety that are appropriate to reasonable schemes of state taxation" as long as the classification is not *per se* or in practical operation palpably arbitrary,' *Lane Corp. v. Comptroller,* 228 Md. 90, 97, 178 A. 2d 904 (1962) [citing *Allied Stores of Ohio, Inc. v. Bowers,* 358 U. S. 522, 526, 79 S. Ct. 437, 3 L.Ed.2d 480 (1959)]. It has long been recognized that taxation is a practical affair, *Frank J. Klein v. Comptroller,* 233 Md. 490, 494, 197 A. 2d 243 (1964), and that 'only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes' can the presumption of constitutionality be rebutted, *Madden v. Kentucky,* 309 U. S. 83, 88, 60 S. Ct. 406, 84 L. Ed. 590 (1940). By its terms the Act does no more than impose a tax on the privilege of

transferring certain property or providing certain services for a consideration at retail. The fact that in a particular instance the effect of the tax imposed may be to treat certain transactions or taxpayers differently, absent a showing that it is without any reasonable basis and is entirely arbitrary, does not amount to such a discriminatory classification as to be violative of constitutional guarantees, *Villa Nova v. Comptroller*, 256 Md. 381, 391, 260 A. 2d 307 (1970).

"The short answer to Hooks' contention is that the Act, § 325, imposes a tax on the 'privilege of selling certain tangible personal property at retail' and § 324 (d) includes, in the definition of a sale, the transfer of possession of such property by rental, lease or license to use. The fact that the effect of the Act in taxing 'transaction[s] * * * whereby * * * possession * * * of tangible personal property is * * * transferred' under § 324 (d) results in different treatment being accorded lessee-drivers, who operate under a lease, and owner-drivers, who do not, is in no way indicative of a wholly unreasonable or impermissible classification. . . ."

Consistent with the rationale of *Hooks*, the Comptroller advances the contention, with which we agree, that it is hardly unreasonable or impermissible that the Legislature, in enacting a retail sales tax, chose to impose the tax upon transactions of sale, but not upon gifts; that in the case of a voluntary tip, there is no tax because the amounts paid are not a part of a contractual obligation of a purchaser to a vendor arising from a taxable retail sale, but in the case of a mandatory service charge, the amounts paid are a required part of a transaction of sale and a contractual obligation of a purchaser to pay to a vendor which arises directly from and as a condition of the making of the sale. We thus conclude, as did the Tax Court, that there is a constitutionally reasonable distinction for sales tax purposes between voluntary and mandatory gratuities. The mere fact that the sales tax is imposed " [f]or the privilege of selling certain

tangible personal property at retail" rather than for the privilege of making gifts is, as the Comptroller argues, a sufficient distinction in itself. Being of the opinion that no discriminatory classification violative of constitutional guarantees exists in this case, and finding no merit in other arguments raised by the Club in support of its position, we shall affirm the Tax Court.

> *Order affirmed; costs to be paid by appellant.*