657 A.2d 808

**DIRECTOR OF FINANCE FOR the MAYOR AND CITY COUNCIL OF BALTIMORE**

v.

**CHARLES TOWERS PARTNERSHIP, et al.**

**No. 1422, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

May 2, 1995.

Melvin J. Sykes (Otho M. Thompson, Carolyn A. Espy and Abraham M. Schwartz, on the brief), Baltimore, for appellant.

Price O. Gielen (Bruce M. Luchansky and Neuberger, Quinn, Gielen, Rubin & Gibber, P.A., on the brief), Baltimore, for appellees Charles Towers, et al.

Kaye Brooks Bushel (T. Scott Basik and Basik, Bushel & Shelton, on the brief), Baltimore, for appellee C & P.

Christopher M. Lee, Melvin J. Kodenski and Kodenski & Canaras, on the brief, Baltimore, for appellee Santoni's, Inc.

Argued before BISHOP, CATHELL and DAVIS, JJ.

DAVIS, Judge.

■ This is an appeal from three orders of the Circuit Court for Baltimore City, each affirming a separate decision by the Maryland Tax Court. Pursuant to an ordinance first enacted in 1947, Baltimore City imposes a tax on the "gross sales price" of "sales for consumption" of electricity. In 1991, C & P Telephone, Santoni's, Inc., Charles Towers Partnership, Baltimore Budget Hotel Partnership, Apartment Services, Inc., and United Holdings Co., Inc. (the taxpayers) filed separate claims with appellant, the City's Director of Finance (the Director), seeking a refund of taxes paid on certain portions of their monthly electric bills. After those requests were denied, the taxpayers sought relief in the Maryland Tax Court, where some of the cases were consolidated. The Tax Court rendered three separate decisions, each of which was decided on a motion for summary judgment. In each case, the Tax Court concluded that the customer and demand charges at issue were not for "sales for consumption" of electricity and thus were not taxable under the ordinance. The cases were consolidated on appeal to the circuit court, and the trial judge affirmed.

Appellant presents three questions for our review, which we restate as follows:

I.  Did the Tax Court err when it concluded, as a matter of law, that the "customer charge" and "demand charge" are not taxable under the Baltimore City ordinance?

II. Did the Tax Court err by failing to give proper deference to the administrative construction placed on the ordinance by the City's Director of Finance?

III. Did the Tax Court err by awarding interest on the amount of the refunds?

## FACTS

In 1947, the Mayor and City Council of Baltimore first levied a tax on sales of electricity delivered to consumers in Baltimore City.[1] The ordinance, now codified as art. 28, § 55 of the Baltimore City Code, provides in pertinent part:

(a)(1) *Artificial or natural gas, electricity, and steam rates.* There is hereby levied and imposed on all *sales for consumption* of artificial or natural gas, electricity and steam delivered in Baltimore City through pipes, wires or conduits within the limits of Baltimore City, hereinafter referred to as "energy sales," and billed after the effective date hereof, a tax at the rate of 8% upon the *gross sales price thereof;*

(emphasis added). It is undisputed that the taxpayers purchased electricity "for consumption" from Baltimore Gas & Electric Company (BG & E). The issue here is whether the tax may be levied against certain portions of their monthly electric bills that do not vary in direct proportion to the actual amount of electricity consumed.

Before the tax court, the parties stipulated that each monthly electric bill includes:

(a) a "customer charge," billed at a flat monthly rate;

(b) "demand charges," based on the maximum monthly demand in kilowatts (KW) during any single half-hour interval;

(c) "energy charges," based on total monthly consumption in kilowatt-hours (Kwh);

---

1. Although the ordinance has been modified since first enacted in 1947, the changes are immaterial for the purpose of the present appeal. *Compare Brooklyn Apartments, Inc. v. Mayor and City Council of Baltimore,* 189 Md. 201, 204, 55 A.2d 500 (1947) (containing the original text of the ordinance) with Baltimore City Code art. 28, § 55 (1988 Rep.Vol. & 1993 Cum.Supp.). The ordinance provides, in part, that sales of gas and electricity made under residential schedules on file with the Public Service Commission are exempt. Art. 28, § 55(c)(4). *See also Brooklyn Apartments,* 189 Md. at 204, 55 A.2d 500. Between 1986 and 1994, the City phased out the application of the tax to certain commercial sales. The tax no longer applies to sales of energy "used directly in manufacturing, assembling, processing or refining." Art. 28, § 55(a)(2).

(d) "fuel rate charges," calculated by multiplying the total Kwh consumed during the month by the dollar amount of the current fuel rate;

(e) a small environmental surcharge, as mandated by MD. CODE ANN. NATURAL RESOURCES § 3–302; and

(f) the City's electricity tax, which is levied against items (a) through (d).

Those charges were billed pursuant to a rate schedule approved by the Public Service Commission (the PSC). Each of the first four charges is designed to recover some portion of the costs incurred by BG & E in producing and delivering electricity to its customers. For example, the customer charge is intended to recover the costs associated with metering, billing, and other administrative functions. Demand charges, on the other hand, are designed to recover the costs associated with the equipment and facilities needed to produce, transmit, and distribute electricity.

The applicable rate schedule, designated as Schedule GL, applies to all BG & E customers who establish a monthly demand of sixty kilowatts or more. Consumers who are billed under Schedule GL pay the same customer charge each month, regardless of the amount of electricity they actually purchase and consume. To determine the amount of the demand charge, BG & E monitors a customer's electricity use each month and identifies the half-hour period in which the customer's consumption of electricity was greatest. The demand charge is calculated by multiplying the number of kilowatts consumed during that half-hour period by a specified dollar amount. Unlike the energy charges and fuel rate charges, the customer charge and demand charges are not based on the actual amount of electricity consumed.

In 1991, the taxpayers each requested a refund of taxes paid on the customer and demand charges during the preceding three years. After those requests were denied, the taxpayers sought relief in the Maryland Tax Court. In deciding the cases at hand, the Tax Court relied upon its decision in the cases consolidated as *Blue Circle Atlantic, et al. v. Baltimore*

*County, et al.,* Misc. Nos. 684–688 (August 15, 1990).[2] Accordingly, a brief review of the Tax Court's earlier decision is in order.

The *Blue Circle* case involved a Baltimore County ordinance that levied a tax against "sales for consumption of electricity." The Baltimore County ordinance was modelled after the Baltimore City ordinance at issue here, and the language was virtually identical.[3] Blue Circle Atlantic, Inc. and four other corporations alleged that the tax was unlawfully levied against the customer and demand charges on their bill.

Because the case involved construction of a tax statute, the Tax Court noted that any ambiguity in the statutory language "must be construed strictly against [Baltimore County] and in favor of Petitioners." The Court then quoted from *State v. Fabritz,* 276 Md. 416, 421–22, 348 A.2d 275 (1975), *cert. denied,* 425 U.S. 942, 96 S.Ct. 1680, 48 L.Ed.2d 185 (1976), wherein Chief Judge Murphy explained:

> [W]here statutory language is plain and free from ambiguity and expresses a definite and sensible meaning, courts are not at liberty to disregard the natural import of words with

---

**2.** We ultimately affirmed the Tax Court's decision in an unreported *per curiam* opinion. *Baltimore County v. Blue Circle Atlantic, et. al.,* No. 1504, Sept. Term, 1991 (filed June 25, 1992), *cert. denied,* 328 Md. 92 (1992). *Blue Circle* was pending in this court during the present litigation, and the proceedings in Tax Court were stayed until our opinion was filed. During the hearing below, both the taxpayers and the trial court relied heavily on our decision in *Blue Circle.* Pursuant to Mᴅ.Rᴜʟᴇ 8–114, our unreported opinions are "neither precedent within the rule of stare decisis nor persuasive authority."

**3.** At the time that the *Blue Circle* cases were decided, the Baltimore County ordinance provided, in part:

> [T]here is hereby levied and imposed on all sales for consumption of electricity delivered in the county, through wires or conduits, a tax at the rate of seven and one-half (7.5) per cent *on the gross sales thereof....*

Baltimore County Code § 11–60(a) (1978 & Supp.1988–89) (emphasis added). The Baltimore City ordinance at issue here provides for a tax "on the gross sales *price* thereof." Baltimore City Code art. 28, § 55(a)(1) (emphasis added). We agree with the taxpayers that the difference between the two ordinances is immaterial to the present appeal.

a view towards making the statute express an intention which is different from its plain meaning.

Applying those principles to the issue presented here, the Tax Court concluded:

> Thus we must determine whether the statutory language is "plain and free from ambiguity." We conclude that the words "sales for consumption of electricity" express a "definite and sensible meaning," namely, sales of electricity actually consumed. We find that customer and demand charges, which are not based on KWH consumed, are not "sales for consumption," and therefore are exempt from the county tax.

In each of the cases consolidated under the present appeal, the Tax Court granted the taxpayers' motions for summary judgment. The Tax Court determined that there was no genuine issue of material fact, and concluded as a matter of law that the City ordinance does not authorize the assessment of the electricity tax against the customer and demand charges, "as those charges are not sales of electricity actually consumed." The Director was instructed to refund the pertinent taxes with interest.[4] The circuit court affirmed the Tax Court's rulings, and this appeal followed.

## LEGAL ANALYSIS

A final order of the Maryland Tax Court is subject to judicial review as provided for contested cases under the Administrative Procedure Act. *See* Md.Code Ann., Tax-General (TG) § 13–532(a) (1988 & Supp.1994). Because the cases before us were decided as a matter of statutory interpretation,

---

4. The amounts of the refunds at issue are as follows:

| | |
|---|---|
| C & P Telephone Company | $152,205.37 |
| Charles Towers Partnership | 16,196.34 |
| Baltimore Budget Hotel Partnership | 4,107.47 |
| Apartment Services, Inc. | 6,906.93 |
| United Holdings Company | 45,337.99 |
| Santoni's, Inc. | 5,113.94 |

we must determine whether the Tax Court's decision was "premised solely upon an erroneous conclusion of law." *Comptroller of Treas. v. Shell Oil Co.*, 65 Md.App. 252, 259, 500 A.2d 315 (1985) (quoting *Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 834, 490 A.2d 1296 (1985)). The standard of review is expansive, and we may freely substitute our judgment for the Tax Court's legal conclusions. *Ramsay, Scarlett & Co.*, 302 Md. at 834, 490 A.2d 1296; *Supervisor of Assessments v. Asbury Methodist Home, Inc.*, 313 Md. 614, 626–27, 547 A.2d 190 (1988).

■ The cardinal rule of statutory construction is to ascertain and carry out the actual intent of the legislature. *Montgomery County v. Buckman*, 333 Md. 516, 523, 636 A.2d 448 (1994). As a general rule, statutes involving taxation must be strictly construed. In *Fair Lanes, Inc. v. Comptroller*, 239 Md. 157, 162, 210 A.2d 821 (1965), the Court of Appeals explained that a reviewing court may not extend the reach of a tax statute "beyond the clear import of the language employed," and where there is doubt as to such a statute's scope, it should be construed "most strongly" in favor of the taxpayer. A strict construction must nonetheless be fair, reasonable, and consistent with the legislative intent. *Maryland State Fair v. Supervisor of Assessments*, 225 Md. 574, 588, 172 A.2d 132 (1961). *See also Supervisor of Assessments v. Trustees of Bosley Methodist Church Graveyard*, 293 Md. 208, 212–13, 443 A.2d 91 (1982); *Hearst Corp. v. State Dept. of Assessments and Taxation*, 269 Md. 625, 643, 308 A.2d 679 (1973). The canon in favor of strict construction "is not an inexorable command to override common sense and evident statutory purpose." *Wynn v. State*, 313 Md. 533, 540, 546 A.2d 465 (1988) (quoting *United States v. Brown*, 333 U.S. 18, 25–26, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1948)).

The task of statutory interpretation begins with the ordinary and natural meaning of the words employed. *Buckman*, 333 Md. at 523, 636 A.2d 448; *Harford County v. Univ. of Md. Med. System*, 318 Md. 525, 529, 569 A.2d 649 (1990). Thus, "where statutory language is plain and free from ambiguity

and expresses a definite and sensible meaning," there is no need to look elsewhere to ascertain the intent of the legislative body. *Fabritz,* 276 Md. at 421–22, 348 A.2d 275. *See also In re Criminal Investigation No. 1–162,* 307 Md. 674, 685, 516 A.2d 976 (1986). The statute must be construed as a whole, so that no word, clause, or phrase is rendered superfluous. *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753 (1993).

We do not agree with the Tax Court's conclusion that the language of the ordinance is "plain and free from ambiguity." The tax at issue here is levied against "sales for consumption" of electricity, at a rate of eight percent "upon the gross sales price thereof." Under the Tax Court's interpretation, the City Council's use of the phrase "sales for consumption" was intended to distinguish charges billed for electricity actually consumed from charges billed for the service of providing electricity. We believe that the Director's interpretation of the statute is also reasonable. The Director contends that the phrase "sales for consumption" means that the tax applies to a purchase for consumption by the ultimate consumer, in contrast to a purchase for the purpose of reselling electricity to other consumers. *See* BLACK'S LAW DICTIONARY 1315 (6th ed. 1990) (defining "retail" as "[a] sale for final consumption in contrast to a sale for further sale or processing"). In other words, the Director suggests that "sales for consumption" of electricity may reasonably be construed to mean "retail sales" of electricity.

Our conclusion that the Director's interpretation is reasonable finds support in the language of a decision rendered by the United States Supreme Court. *See McGoldrick v. Berwind–White Coal Mining Co.,* 309 U.S. 33, 60 S.Ct. 388, 84 L.Ed. 565 (1940). *Berwind–White* involved a retail sales tax imposed by the City of New York. Writing for the Court, Justice Stone noted that "[t]he question for decision is whether the New York City tax laid upon *sales of goods for consumption,* as applied to respondent, infringes the commerce clause of the Federal Constitution." *Id.* at 41, 60 S.Ct. at 390 (emphasis added). Justice Stone explained the nature of the tax as follows: "The ultimate burden of the tax, both in

form and in substance, is thus laid upon the buyer, *for consumption*, of tangible personal property, and measured by the sales price." *Id.* at 43, 60 S.Ct. at 391 (emphasis added). The Court's opinion makes it clear that the Court regarded the phrase "sales of goods for consumption" as being synonymous with "sales of goods at retail."

We find further support in *Topps Garment Mfg. Corp. v. State*, 212 Md. 23, 128 A.2d 595 (1957), where the Court of Appeals considered a constitutional challenge to a Maryland statute requiring vendors to collect a tax on tangible personal property sold for "use, storage, or consumption" within the state. With regard to the *Berwind–White* case, Judge Hammond noted that "the Supreme Court equated the New York City tax on *sales for consumption* in the City with the ordinary use tax ... that the Court had previously sustained as constitutional." *Id.* at 29, 128 A.2d 595 (emphasis added). Because the precise phrase "sales for consumption" does not appear in the *Berwind–White* opinion, we assume that Judge Hammond deliberately selected those words to convey a particular meaning. Thus, Judge Hammond and the other members of the Court plainly understood the phrase "sales for consumption" to mean "retail sales."

The opinions in both *Topps* and *Berwind–White* support our conclusion that the ordinance at issue here may reasonably be construed as a tax upon the "gross sales price" for "retail sales" of electricity. The Tax Court and circuit court, however, endorsed a different interpretation. When a statute is plainly susceptible of more than one meaning, "courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment." *Allied Vending v. City of Bowie*, 332 Md. 279, 306, 631 A.2d 77 (1993) (quoting *Kaczorowski v. City of Baltimore*, 309 Md. 505, 513, 525 A.2d 628 (1987)). *See also Fabritz*, 276 Md. at 421–22, 348 A.2d 275. Under those circumstances, a reviewing court may consider the consequences flowing from one meaning rather than another, and should avoid a construction that produces an unreasonable result or is inconsistent with common sense. *Kaczorowski*,

309 Md. at 513, 525 A.2d 628; *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 75, 517 A.2d 730 (1986).

The Tax Court concluded that the City's electricity tax may be levied only against those charges which are directly proportional to the number of kilowatt hours consumed. We think that the Tax Court's conclusion would lead to unreasonable, nonsensical results. Among the documents submitted to the Tax Court was an affidavit from D. Douglas DeWitt, Director of Rate Research for BG & E. According to Mr. DeWitt:

> All customers pay a demand component as a part of BG & E's product cost. For residential customers and for non-residential customers with demands of less than 60 kilowatts, *all costs including the demand component are included as part of the kilowatt hour or energy rate.*

(Emphasis added). In other words, the demand component paid by these customers is billed on a per-kilowatt-hour basis, and would be taxable under the interpretation advanced by the Tax Court. We think it illogical to conclude that the City Council intended to levy a tax against the demand component paid by some customers, but not against the demand component paid by others, when the sole distinction between those customers is the manner in which the charges are calculated and billed.

An opinion and order rendered by the Public Service Commission provides further support for our conclusion that the Tax Court's interpretation is inconsistent with the legislative intent. *See Re Baltimore Gas and Electric Co.*, 73 PSC 6 (1982). In that opinion, the Commission discussed at length the general guidelines to be used in designing BG & E's electrical rates. Under state law, the Commission's rate-setting efforts are guided, in part, by MD.ANN.CODE art. 78, §§ 26(a), 28(d), and 56 (1991 Repl.Vol. & Supp.1994), which collectively provide that rates shall not "extend undue or unreasonable preferences to any particular person or class of service, and that rates not discriminate against or result in undue or unreasonable prejudice to any particular person or class of service." *Baltimore Gas and Electric*, 73 PSC at 12.

At the time of the Commission's decision, the proper method of allocating the cost of BG & E's generating plant and facilities was vigorously contested. The debate centered, in part, on whether those costs should be included in the "energy charges," which are billed on a per-kilowatt-hour basis. The Commission concluded:

[T]he degree to which plant costs are allocated between demand and energy costs is a matter of judgment; it depends upon many factors, including the types of generating facilities on the utility's system; the mix of base load, intermediate and peak units; and the load characteristics of the system and the various customer classes.

*Id.* at 15. The design of electric rates is a complex, technical process that relies heavily on the expertise and judgment of the Public Service Commission. Under the Tax Court's interpretation of the City ordinance, the City's revenues under the electricity tax would depend, in part, on decisions made by the Commission. We do not believe that the City Council intended such a result.

■ As a final guide to construction, we must give some weight to the Director's administrative interpretation of the ordinance. The ordinance provides, in part:

(d) *Regulations.* The Director of Finance is hereby authorized to adopt such rules and regulations as may be necessary to insure the collection of the tax imposed by this section and to define any terms used in this section.

Baltimore City Code art. 28, § 55(d). Although the Director has not adopted formal rules or regulations, it has been the City's long-standing practice to treat the ordinance as a tax on retail sales of electricity.[5] According to Mr. DeWitt, Director

---

5. According to Ottavio M. Grande, City Collector, a waste processing facility operated in Baltimore City (the "BRESCO" incinerator) produces electricity which is transmitted and sold to BG & E "for ultimate resale" to BG & E customers. During Grande's tenure as City Collector and Assistant City Collector, which began in 1976, the City has never collected utility taxes on these sales "because wholesale sales of

of Rate Research for BG & E, both Baltimore City and the State of Maryland "have continuously and consistently included customer and demand charges in their respective taxable basis calculations since 1947." [6]

When a reviewing court construes a statute, we will generally give some weight to the long-standing administrative practice of the agency responsible for administering the statute, so long as that practice is not inconsistent with the plain meaning of the words employed by the legislature. *Controller v. Pleasure Cove Yacht Club*, 334 Md. 450, 466, 639 A.2d 685 (1994); *Fishkind Realty v. Sampson*, 306 Md. 269, 283, 508 A.2d 478 (1986). The weight we give to an administrative interpretation varies, depending on the facts of each particular case. The relevant factors include whether the interpretation has resulted from a rule-making process or contested adversarial proceeding, and the consistency and length of the administrative interpretation or practice. *Magan v. Medical Mut. Liab. Ins. Soc.*, 331 Md. 535, 546–47, 629 A.2d 626 (1993); *Comptroller v. John C. Louis Co.*, 285 Md. 527, 544–45, 404 A.2d 1045 (1979). Although the Director's interpretation has not been embodied in formal rules, the Director's interpretation has been applied "continuously and consistently" for more than forty years. Moreover, we note that "[l]egislative acquiescence in a long-standing administrative construction gives rise to a strong presumption that the interpretation is correct." *Maryland Classified Employees Ass'n v. Schaefer*, 325 Md. 19, 33–34, 599 A.2d 91 (1991).

electricity to a utility which is not the ultimate consumer of such electricity would not be subject to the City utility tax."

6. The record includes a "general service" rate schedule filed with the PSC in 1947. Then, as now, the demand charge was not based on the number of kilowatt hours actually consumed. Under the 1947 rate schedule, the demand charge was calculated from "the maximum measured demand in the 12 months ended with the current billing month, but not less than two-thirds of the maximum billing demand in the preceding eleven months." In other words, the demand charge was based on a customer's peak demand during a one-month period, rather than the current thirty-minute period.

Consequently, we think the Director's administrative interpretation is entitled to significant weight.

In light of the foregoing considerations, we conclude that the phrase "sales for consumption" of electricity was intended to distinguish between "retail" and "wholesale" sales of electricity. The use of the adjective "gross" indicates that the City Council intended to levy the tax against the "whole," "total," or "entire" sales price. BLACK'S LAW DICTIONARY 702 (6th ed. 1990). By using the phrase "gross sales price," the City Council intended to tax all charges that might reasonably be construed as part of the total sales price for electricity. Had the City Council intended to impose a tax on the "price per kilowatt-hour" thereof, the Council could have said so directly. *Compare* TG § 9–305 (imposing a tax "for each gallon of gasoline other than aviation gasoline"); TG § 12–105 (imposing a tax "for each package" of cigarettes).

■ Having reached that conclusion, we must determine whether the customer charge and demand charges may properly be taxed as part of the gross sales price. As we noted earlier, an ordinance involving taxation must be strictly construed in favor of the taxpayer. *See Pleasure Cove,* 334 Md. at 464, 639 A.2d 685. The Tax Court concluded that the charges at issue do not, in themselves, constitute "sales for consumption" of electricity. The taxpayers argue that the customer and demand charges constitute "charges for the service of providing electricity" rather than "charges for the actual use of electricity." We agree with the taxpayers on that point. As the Public Service Commission noted in *Baltimore Gas and Electric,* 73 PSC at 12–13, the rates charged to each class of customer are designed to reflect "the cost of providing service to that class."

It does not follow, however, that the cost of providing service is not taxable as part of the "gross sales price" for retail sales of electricity. The pertinent legal principles may be gleaned from a series of cases dealing with other tax statutes. The first two cases involve the tax on "admissions." Pursuant to TG § 4–102, a county or municipal organization

may impose a tax on "the *gross receipts* derived from any admissions and amusement charge" within · its jurisdiction (emphasis added). In *Scoville Serv. Inc. v. Comptroller of the Treasury,* 269 Md. 390, 306 A.2d 534 (1973), the Court of Appeals considered whether a charge for parking at Laurel Raceway was subject to the admissions tax. Scoville Service, Inc. (Scoville) operated a parking lot on land adjacent to the racetrack. Although the land itself was owned by the Laurel Harness Racing Association, the parking operation was a separate enterprise. During the racing season, the parking area was used exclusively by those attending the races. Scoville charged a flat rate for each automobile, regardless of the number of passengers. The admission fee to the racetrack was charged separately, at a gate leading into the track.

Under those circumstances, the Court of Appeals held that the parking fee did not constitute part of the "gross receipts" from admission to the racetrack. The Court explained:

> That one may park on the lot has nothing whatever to do with his entry into the racetrack. Patrons must, in any event, pay to enter the track, and automobile passengers (other than the driver), as well as those traveling by public transportation or living nearby, pay no parking charge. Similarly one is free to park in Scoville's lot and not enter the racetrack at all.

*Id.* at 395, 306 A.2d 534. The admissions tax, the Court concluded, was intended to be a tax on the "price of entrance" to any place, "and not on a service provided for one's convenience *prior* to entering." *Id.*

The Court of Appeals reached a similar result in *Washington Nat'l Arena Ltd. Partnership v. Comptroller,* 308 Md. 370, 519 A.2d 1277 (1987). The appellant in that case operated a sports and entertainment arena in Prince George's County. The seating at the arena included sky suites and other special seating arrangements. Patrons who purchased this special

seating also received certain amenities,[7] including reserved parking and membership in the Capital Club, a restaurant and bar located within the confines of the arena. Notwithstanding the fact that the arena charged a single sum for both the admissions and the amenities, the Court of Appeals concluded that the price of the amenities was not taxable as part of the "gross receipts" from admissions. The Court explained:

In *Scoville* we looked to the plain meaning of the word "admission" to determine legislative intent. We cannot extend a legislative intent to tax admission to an intent to tax things *only remotely or tangentially related to admissions.* In short, we think that when a package includes the price of admission and the price of largely unrelated amenities, the legislature intended there to be an allocation of the charge between that portion relating to admissions and that portion not so related.

*Id.* at 376, 519 A.2d 1277. (emphasis added; footnote omitted). The Court concluded that the legislature did not intend to tax items that are not "reasonably related or functionally subordinate" to the cost of admission. *Id.* at 377, 519 A.2d 1277. In reaching that conclusion, however, the Court rejected the argument that parking was not a taxable admission charge as a matter of law. After reviewing the facts of *Scoville*, 269 Md. 390, 306 A.2d 534, the Court explained:

Thus, the charge for parking was not a charge for admission to the track. But if the parking privilege is tied to admission to particular events, and is used only in connection with attendance at those events, a fact-finder could determine that parking is reasonably related or functionally subordinate to the price of admission.

*Washington Nat'l Arena*, 308 Md. at 377, 519 A.2d 1277.

The Court of Appeals applied a similar analysis in *Baltimore Country Club, Inc. v. Comptroller*, 272 Md. 65, 321 A.2d

---

7. Each sky suite, for example, included its own liquor cabinet, wet bar, bathroom, closed circuit television, stereo facilities, telephone service, and living room furniture. *Washington Nat'l Arena*, 308 Md. at 373, 519 A.2d 1277.

308 (1974), a case involving the Maryland Retail Sales Tax, now codified at TG § 11–101 *et seq.* The statutory definition of "retail" sale included "the sale of any meals, food or drink for human consumption on the premises where sold." *See Baltimore Country Club*, 272 Md. at 66, 321 A.2d 308. For many years, the Baltimore County Club had added a 15% mandatory gratuity or "service charge" to the stated price for food and beverages. Notwithstanding the fact that the language of the statute did not provide for a tax on those services, the Court concluded that the mandatory service charge was subject to the tax.[8] The Court explained:

> As shown by the agreed statement of facts in the present case, in making sales of food and beverages to its members, service is always provided by the Club as *an integral part of the transaction.* The mandatory service charge imposed by the Club as part of the sale is a legally binding contractual obligation upon the purchaser, one "automatically and invariably" levied and required to be paid as a constituent part of the "price" of the sale.

*Id.* at 73, 321 A.2d 308 (emphasis added).

The principles that emerge from *Scoville, Washington Nat'l Arena,* and *Baltimore Country Club* were considered most recently in *Pleasure Cove*, 334 Md. 450, 639 A.2d 685. The dispositive issue in that case concerned the scope of MD.ANN. CODE art. 24, § 9–602, which authorized Anne Arundel County to collect a tax on "space rentals," including fees for the docking or storage of boats. In addition to annual dues, Pleasure Cove Yacht Club charged a separate fee to members for rental of a slip, outside storage rack, or indoor storage space. Prior to 1989, the rental fee covered the cost of certain "marina services," including forklift services, electricity, trash removal, security, snow removal, assistance with "canvassing" boats, keeping the water free from ice in the winter, and

---

**8.** Subsequent to the Court's decision, the statute was amended to exclude "a mandatory gratuity or service charge in the nature of a tip for serving food or beverage to a group of 10 or fewer individuals...." TG § 11–101(i)(3)(i)(4).

periodic checking of bilge pumps. In 1989, Pleasure Cove reduced the rental fee and charged members separately for marina services. The Court of Appeals rejected the Tax Court's conclusion that the charge for marina services was taxable. In reaching that conclusion, the Court distinguished *Pleasure Cove* from its earlier decision in *Baltimore Country Club*, 272 Md. 65, 321 A.2d 308:

> With regard to the *Baltimore Country Club* case, restaurant service is inherently necessary to the sale of restaurant meals and is usually not optional. . . . Since the mandatory gratuity was, in essence, part of the cost of the meal, it was held to be subject to the retail sales tax.
>
> The marina services involved here, on the other hand, are not *inherently necessary* to the wet slip, outside rack, or boatel rental. Boat slip renters are capable of performing the marina services on their own and quite often do. Checking bilge pumps, breaking up ice around boats, cleaning and canvassing boats, etc., are all activities performable without the assistance of the marina staff. Likewise, members do not necessarily require a marina forklift to get their boats into and out of the water. There is nothing in the record to suggest that a renter may not use his or her own boat trailer or other means for that purpose.

*Id.* 334 Md. at 462–63, 639 A.2d 685 (emphasis added; footnote omitted).

Applying these principles to the case at hand, we conclude that the customer charge and demand charges may be taxed as part of the "gross sales price" of electricity. As in *Baltimore Country Club*, the charges at issue here are "automatically and invariably" levied as part of each monthly electricity bill for all customers who are billed under Schedule GL. The taxpayers do not have the option to forego those charges. For practical reasons, they cannot purchase the "service" of providing electricity from a different supplier, nor can they make other arrangements for delivery of the electricity they intend to consume. *Compare Scoville,* 269 Md. at 395, 306 A.2d 534 (noting that patrons who do not park in Scoville's lot

are free to enter the racetrack without paying the parking fee).

More importantly, the service of providing electricity is both "functionally subordinate" and "inherently necessary" as part of any transaction involving the "sale for consumption" of electricity. *See Washington Nat'l Arena,* 308 Md. at 376–77, 519 A.2d 1277; *Pleasure Cove,* 334 Md. at 463, 639 A.2d 685. The documents considered by the Tax Court included an affidavit by Alan Haymes, the Director of the Public Service Commission's Rate Research & Economics Division. According to Mr. Haymes:

> The sale of electricity involves a number of processes. These processes include production, transmission, distribution, metering and billing, various administrative functions and the consumption of fuel. *All of these processes are necessary in order for electricity to be produced and delivered to customers for consumption.*

> *       *       *       *       *       *

> Utility rates are set forth in terms of different charges including customer charges, demand charges, energy charge and fuel rate charges for the purpose of accurately allocating different cost components to different customer classes.... [E]ach cost component and each charge represents a facet of the total expense involved in producing and distributing electricity ...

(emphasis added).

The taxpayers contend that *Baltimore Country Club* and *Pleasure Cove* are inapposite because the present case does not involve a general retail sales tax.[9] We think it useful to set forth the argument made by the taxpayers in more detail:

---

9. In *Pleasure Cove,* 334 Md. at 463, 639 A.2d 685, the Court of Appeals explained:

> [T]he tax at issue in this case is not a general retail sales tax like that involved in *Baltimore Country Club* and *Hooks* [*v. Comptroller,* 265 Md. 380, 289 A.2d 332 (1972)]. Instead, it is a sales tax applied to a very specific item—a space rental.

Appellant argues that, unlike marina services, demand and customer charges are "inherently necessary" to the provision of electricity sold and, thus, subject to the electricity tax. This argument fails to recognize that the customer and demand charges are for something other than the commodity which is subject to the tax. Those charges are not based on the amount of electricity consumed and are no more "sales for consumption of electricity," than the marina charges were for space rental.

(Footnote omitted). In a nutshell, the taxpayers argue that charges which are not sales of *electricity* are not subject to the tax, as a matter of law. In *Washington Nat'l Arena,* 308 Md. 370, 519 A.2d 1277, the Court of Appeals squarely rejected a similar argument with regard to the admissions tax. As the Court explained in *Scoville,* 269 Md. 395, 306 A.2d 534, the reach of the admissions tax is limited to the "price of entrance" to "any place." Thus, a parking fee does not constitute a charge for admissions. Nonetheless, the Court subsequently concluded that parking fees might, under proper circumstances, be taxable as part of the "gross receipts" from admission. *See Washington Nat'l Arena,* 308 Md. at 377, 519 A.2d 1277.

The fact that the tax at issue here is not a general retail sales tax does not alter our analysis or conclusion. Although we agree that the customer and demand charges constitute charges for the service of providing electricity, we nonetheless hold that those charges may be taxed as part of the "gross sales price" of "sales for consumption" of electricity.

As the Court of Appeals explained in *Washington Nat'l Arena,* 308 Md. at 377, 519 A.2d 1277, resolution of the question presented here ordinarily requires a factual determination by the Tax Court. Because the Tax Court concluded that there was no genuine dispute of material fact, we think it unnecessary to remand the case for factual findings. When the affidavits and other documents submitted to the Tax Court

---

The Court, unfortunately, said nothing more about the import of that distinction.

are considered under the correct legal standard, no "reasoning mind reasonably could have reached" the conclusion that the customer and demand charges are not taxable. *Ramsay, Scarlett & Co.*, 302 Md. at 836, 490 A.2d 1296. Accordingly, the Director was entitled to judgment as a matter of law.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED.**

**CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO ENTER ORDERS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEES.**