SWYGERT, Senior Circuit Judge.
 

 The plaintiff, States Steamship Company (“States”), is a common carrier operating cargo vessels. It qualified for and received operating subsidies from the Maritime Administration (“MARAD”) pursuant to the Merchant Marine Act of 1936, ch. 858, 49 Stat. 1985, 46 U.S.C. §§ 1101
 
 et seq.
 
 (“the Act”). As a condition to receiving subsidies, States was required under section
 
 *1283
 
 607(b) of the Act to create and maintain a capital reserve fund out of its gross earnings and to deposit into this fund an amount equal to its annual depreciation on the subsidized vessels. States also entered into a closing agreement with the Internal Revenue Service (“the IRS”) in order to effect a uniform solution to tax problems arising under section 607 of the Act. If the amount of depreciation deposits required by MARAD exceeded the amount of depreciation normally allowed for tax purposes, then the excess deposit was tax-deferred. It is this excess depreciation that underlies the controversy in this case.
 

 Pursuant to the Act, MARAD promulgated regulations pertaining to the method of computing depreciation of the subsidized vessels in relation to the required deposits to the shipper’s capital reserve fund. The basis of each subsidized vessel was the full construction cost; depreciation was computed on a straight-line basis with a twenty-five year life for each vessel. Prior to 1969 the basis for each vessel was reduced by salvage value set at 2.5% of the original construction cost. From 1960 to 1968 States computed depreciation on these terms and made the required deposits.
 

 Effective January 1, 1969 MARAD amended its regulations by increasing the salvage value of the subsidized vessels from 2.5% to 17%. This amendment reduced the operator’s annual deposit into the fund and also reduced the amount of tax-deferred excess depreciation. States complied with the new regulation, but, along with other operators, challenged it in federal court. The United States District Court for the District of Columbia eventually found the regulation invalid and enjoined MARAD from enforcing it. The court’s order further stated that operators, while not required to deposit depreciation for the years 1969, 1970, and 1971 on the basis of the 2.5% salvage value, could do so voluntarily.
 

 From 1969 through 1971, States had made deposits into the fund pursuant to the 17% figure. For this reason there was no excess depreciation and so no tax-deferral. In late 1971, immediately after the district judge’s oral ruling invalidating the regulation, taxpayer accrued on its books depreciation deposits to its capital reserve fund in the amounts that would have been required for the years 1969, 1970, and 1971 if the lower salvage value of 2.5% had been used. In 1969 the additional amount was $720,815; in 1970, $775,606; and in 1971, $825,135. States excluded the total of this amount ($2,231,556) from gross income on its 1971 tax return. This resulted in a net operating loss for the year, which it claimed as a carry-back to 1968.
 

 The IRS disallowed the claim. It contended that the excess depreciation should be claimed in each separate year in the amount stated. The effect of its ruling was to reduce the claimed carry-back loss and increase the tax owed for 1968 by $354,898. The IRS assessed this amount plus interest.
 

 On December 4, 1978 States filed bankruptcy proceedings under Chapter XI of the Bankruptcy Act, 11 U.S.C. §§ 701
 
 et seq.
 
 repealed as of October 1, 1979. The IRS filed a priority claim for the unpaid income taxes plus interest. States objected to this claim, but the bankruptcy court denied the objection because the $2,231,566 represented tax benefits arising from income earned over the years 1969, 1970, and 1971. States appealed to the district court which affirmed the decision and adopted the reasoning of the bankruptcy court. This appeal followed.
 

 I
 

 The Act required States to deposit into its capital reserve fund an amount equal to the annual depreciation on its subsidized vessels. When the depreciation computed by MARAD regulations exceeded the regularly permitted depreciation, the closing agreement between States and the IRS allowed States to treat the excess depreciation deposit as a tax-deferred income item.
 

 Paragraph III of the closing agreement provides that the deferral benefit is to
 
 *1284
 
 be taken in the year that the income accrued without regard to when the deposit is actually made.
 
 [1]
 
 Otherwise a company could bunch together deferrals for several years, make one huge deposit in one year, and thereby materially distort its income picture. The Commissioner’s
 
 Interpretative Bulletin
 
 also supports this position. It states in pertinent part:
 

 Is it the general intent [of the industry-wide closing agreements] that whatever tax-benefits are accordable to any income deposited in a Reserve Fund, shall relate back to the year in which such income would otherwise have been taxable?
 
 Answer:
 
 Yes.
 

 Interpretative Bulletin
 
 (November 1947) Article VI(A) at 4.
 

 It is undisputed that if the MARAD regulation had not been issued, then States would have been required to take the tax deferred benefit on the $720,815, $795,606, and $825,135 in the years 1969, 1970, and 1971, respectively. States contends that the presence of this regulation, even though subsequently declared invalid, somehow changes the tax result. We disagree.
 

 States has sought to obtain a substantial tax windfall by bunching all the excess depreciation of three years into one year. This attempt violates the intent of the closing agreement, the
 
 Interpretative Bulletin,
 
 and the Act. The intent is to match the years of the tax deferral benefit to the years in which the income generating those benefits accrued. Paragraph 111(b) and the
 
 Interpretative Bulletin
 
 connect the timing of the tax benefits, to the income giving rise to it. The purpose is to prevent distortion of income in any one year, which is exactly what States attempted to do here.
 

 A closing agreement is a written contract between the taxpayer and the Secretary of the Treasury. Its purpose is to resolve a tax dispute and it can have an ongoing effect — to resolve an issue expected to rise in the future. Treas.Reg. § 301.-7121-l(b)(3) (1960). The theory behind closing agreements is “once and for all to terminate and dispose of tax controversies.” 9 Mertens,
 
 Law of Federal Income Taxation,
 
 § 52.09 at 15.
 

 It is clear that the excess depreciation amounts relate to the years 1969, .1970, and 1971. The invalidation of the regulation concerning computation of salvage value allowed States to take a greater depreciation in each of the three years. The tax benefit, therefore, must likewise be matched to each of those years. The Act and the closing agreement, when read with their natural meaning, require a matching of the benefit of tax deferral to the years in which the income arose.
 
 [2]
 

 The order of the district court is affirmed.
 

 [1]
 

 . Paragraph III of the closing agreement reads:
 

 Accrual of Deposits:
 

 (a) The benefit of the deposit of capital gains derived in any year from requisition, casualty, or sale of a vessel, the proceeds of which are deposited in Reserve Funds, shall be allowed in the same year that the capital gains accrued, regardless of the date of actual deposit.
 

 (b) The benefit of deposits of ordinary income in the Reserve Funds shall be allowed in the same year that such income accrued, regardless of the date of actual deposit, provided that, as to voluntary deposits, the application for approval by the Administration of the deposit shall be filed within the taxable year or within a reasonable time after the close of such taxable year.
 

 [2]
 

 . Given our disposition of this case, we need not address whether the depreciation accrued in 1971 or 1972.