842 A.2d 732

SUPERVISOR OF ASSESSMENTS OF ANNE
ARUNDEL COUNTY, Maryland

v.

HARTGE YACHT YARD, INC.

No. 45, Sept. Term, 2003.

Court of Appeals of Maryland.

Feb. 12, 2004.

454

David M. Lyon, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellant.

David C. Barclay (Simcox and Barclay, LLP, Annapolils), Richard T. Wright (Richard T. Wright, P.C., Annapolis), on brief, for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and JOHN C. ELDRIDGE (retired, specially assigned), JJ.

CATHELL, J.

This case concerns the appropriate classification for taxation purposes of mooring buoys [1] located in the West River in Anne

---

1. Under COMAR 08.04.01.14:

" 'Mooring' means a buoy, piling, stake, or other apparatus used to secure, berth, or moor vessels in the waters of the State. It does not include fixed piers connected to the shore or accessory structures directly related thereto that are subject to separate State approval procedures."

We note that a mooring buoy may be very different from other forms of moorings. Our holding in the case *sub judice* as to the nature of mooring buoys in respect to the law of fixtures applies only to mooring

Arundel County. Basically, the question before this Court is whether these mooring buoys should be assessed as real or personal property when they are placed in the waters of the State.

The case *sub judice* has its origins in a 1994 decision by the Maryland Tax Court, *Whitestake Associates v. Supervisor of Assessments of Anne Arundel County,* No. 1051, slip op. (Md. Tax Ct. Feb. 4, 1994), which was an administrative appeal of the 1991 real estate tax assessment of the real property owned by Whitestake Associates Limited Partnership ("Whitestake") and leased to Hartge Yacht Yard, Inc. ("Hartge") for Hartge's marina operations. In that case, the Maryland Tax Court ruled that the Supervisor of Assessments of Anne Arundel County could not assess the mooring buoys at the marina to Whitestake because the moorings were owned by Hartge. Judicial review of that ruling of the Maryland Tax Court was not sought.

After the 1994 Tax Court ruling, the State Department of Assessments and Taxation ("SDAT") issued a real property tax assessment for the mooring buoys owned and used by Hartge in its marina operation for tax years 1996, 1997, 1998, and 1999. Hartge challenged the assessment of the moorings as real property for taxation purposes. The Supervisor of Assessments of Anne Arundel County, petitioner, affirmed the assessment and Hartge then appealed to the Property Tax Assessment Appeals Board for Anne Arundel County ("PTAAB"). After PTAAB also affirmed the assessment, Hartge appealed administratively to the Maryland Tax Court. During this hearing, the Maryland Tax Court ordered that Whitestake be brought in as a party. In an oral opinion on November 14, 2001, the Tax Court affirmed the classification of the mooring buoys as real property taxable to Hartge. The Tax Court issued a final order on January 18, 2002.

---

buoy apparatuses. We do not address the character of other types of moorings.

Both Hartge and Whitestake sought judicial review of the Maryland Tax Court decision in the Circuit Court for Anne Arundel County. In a well-reasoned Memorandum Opinion and Order by Judge Nancy Davis–Loomis, dated December 17, 2002, the Circuit Court reversed the Maryland Tax Court decision. Petitioner filed an appeal to the Court of Special Appeals. On July 28, 2003, prior to consideration by the Court of Special Appeals, we issued a Writ of Certiorari. *Supervisor of Assessments v. Hartge,* 376 Md. 139, 829 A.2d 530 (2003).

Petitioner presents one question for our review:

"Since the mooring buoys were owned and utilized by the long term operator of the marina, had been permanently positioned in the West River for 20 to 60 years, and had been registered as a group mooring with the Department of Natural Resources ('DNR') since 1989, did the Maryland Tax Court properly apply Tax–Property Article, § 6–102(e) when it determined that mooring buoys, together with the State owned river bottom, were taxable to Hartge as real property?"

We answer petitioner's question in the negative and hold that the Maryland Tax Court improperly applied § 6–102(e) of the Tax–Property Article in regard to Hartge's mooring buoys. As we will discuss, *infra,* the mooring buoys at issue do not meet the elements of "fixtures" under Maryland law and, as such, are not deemed real property for taxation purposes. At best, they are, under the circumstances of this case, "trade fixtures" and properly classified as personal property for taxation purposes. Furthermore, despite petitioner's argument to the contrary, the application of § 6–102(e) does not change this classification. Even if Hartge was "the owner of the property," here, the relevant portion of the river, the mooring buoys that have been placed there would still not be considered permanent fixtures. Under § 6–102(e), Hartge's mooring buoys would still be classified as personal property for taxation purposes. Accordingly, we affirm the judgment of the Circuit Court for Anne Arundel County.

## I. Facts

Hartge Yacht Yard, Inc. ("Hartge") operates a marina on the West River in Anne Arundel County on land that it leases from Whitestake Associates, L.P. ("Whitestake"). Since 1973, Hartge has maintained mooring buoys in the West River in conjunction with its marina operations.[2] Each buoy consists of a float with a boat tie and a steel chain connected to an anchor weighing 100 to 300 pounds. These anchors rest on the river bottom. The rest of the apparatus extends upward to and on the surface. The mooring buoys are inspected regularly and the individual parts are replaced over time. About every ten years, the entire mooring assembly is pulled up by a crane on a barge for a complete inspection. During these inspections, any necessary repairs are done and the mooring, including its anchor, is returned to the river.

In 1989, Hartge registered a group mooring[3] with the Department of Natural Resources in accordance with COMAR 08.04.13.03.[4] Hartge was permitted to register the group mooring because it complied with the requirements that it have an interest in the adjacent commercially-zoned riparian land and that it provide a specified number of motor vehicle parking spaces. This group mooring registration is renewable every three years.[5]

---

**2.** We note that COMAR 08.04.13.02 states the limited areas in which moorings *may not* be placed. Moorings may not be established in:
"(1) Public shellfish beds;
(2) Private shellfish beds, unless permission is obtained from the leaseholder;
(3) Cable crossing areas."

**3.** COMAR 08.04.01.10 states that " 'Group moorings' means the mooring by a person of three or more vessels."

**4.** COMAR 08.04.13.03(A) states, in pertinent part, that:
"A person may not establish a group mooring unless validly registered with the Department or a designated local government authority."
Individual personal moorings are apparently not required to be registered. Their placement in the waters of the State, however, continues to be limited by COMAR 08.04.13.02.

**5.** *See* COMAR 08.04.13.03(F).

As part of its marina operation, Hartge rents the mooring buoys to boat owners. For a rental fee, the boat owner receives the right to tie up and leave a boat attached to the mooring buoy with the expectation that it will remain in place, the right to access the water from the land at the marina, and the right to park a car at the marina. This rent is part of the operating income of the marina which is conducted as a business for profit.

In 1994, Whitestake successfully appealed an SDAT decision to tax the mooring buoys as Whitestake's property. In 1999, the Supervisor of Assessments for Anne Arundel County sent out two assessment notices assessing 74 mooring buoys owned by Hartge as real property. The notices covered fiscal years 1996, 1997, 1998, and 1999 on the basis that the buoys were "escaped property." [6]

Witnesses for the Supervisor of Assessments stated at the Tax Court hearing that, since approximately the 1970s, mooring buoys have been valued as real property when considering the value of a marina for tax purposes. These witnesses, however, did admit at the hearing that this case was unique in that the owner of the mooring buoys was different than the owner of the fast land associated with their use.

In an oral opinion rendered on November 14, 2001 and affirmed by a written "Order" dated January 18, 2002, the Maryland Tax Court found that the river bottom is owned by the State of Maryland and that Hartge had a "nonexclusive" privilege to place the mooring buoys on the river bottom. The Tax Court found that this privilege was a sufficient use to be taxed as "real property" under Maryland Code (2001 Repl.

---

**6.** The rule regarding "escaped property," in a tax context, can be found at Md.Code (2001 Repl.Vol.), § 8–417 of the Tax–Property Article. It states, in pertinent part:

"(a) *Defined.*—In this section, 'escaped property' means any property that:

(1) is subject to assessment for property tax purposes; and

(2) has not been assessed.

(b) *When assessed.*—Notwithstanding § 8–418 of this subtitle, after it is discovered, escaped property is assessed in the same manner as other similar property is assessed."

Vol.), § 6–102(e) of the Tax–Property Article.[7] The Tax Court further found that the mooring buoys were permanent fixtures to the river bottom.

On judicial review in the Circuit Court for Anne Arundel County, Judge Nancy Davis–Loomis, in a decision dated December 17, 2002, reversed both rulings of the Maryland Tax Court. First, the Circuit Court held that the Maryland Tax Court had wrongly applied § 6–102(e) of the Tax–Property Article. The Circuit Court found that Hartge had a renewable license to use mooring buoys and had not been granted a real property interest in the river bottom. Therefore, the Circuit Court concluded that § 6–102(e) did not apply.

Secondly, the Circuit Court disagreed with the Maryland Tax Court's conclusion that the mooring buoys were permanent fixtures and therefore taxable as real property. The Circuit Court found that the anchors merely rested on the river bottom, were kept there by weight only, and were not affixed in any way. The court then applied the "trade fixture" test and concluded that the buoy moorings were to be considered trade fixtures and, therefore, "personal property."

Petitioner then appealed the Circuit Court ruling to the Court of Special Appeals. On July 28, 2003, prior to consideration by the Court of Special Appeals, we issued a Writ of Certiorari.

## II. Standard of Review

■ We begin by noting the appropriate standard of review. The Maryland Tax Court is an administrative agency.

---

**7.** Section 6–102(e) of the Tax–Property Article provides:

"(e) *Interests in government property.*—Unless exempted under § 7–211, § 7–211.1, or § 7–501 of this article, the interest or privilege of a person in property that is owned by the federal, the State, a county, or a municipal corporation government is subject to property tax as though the lessee or the user of the property were the owner of the property, if the property is leased or otherwise made available to that person:

(1) by the federal, the State, a county, or municipal corporation government; and

(2) with the privilege to use the property in connection with a business that is conducted for profit."

*See Read v. Supervisor of Assessments of Anne Arundel County,* 354 Md. 383, 391, 731 A.2d 868, 872 (1999). Maryland Code (1988, 1997 Repl.Vol.), § 13–532(a) of the Tax–General Article provides that the final order of the Tax Court is subject to judicial review as provided in §§ 10–222 and 10–223 of the State Government Article, which govern the standard of review for decisions of administrative agencies. The standard of review for Tax Court decisions is generally the same as that for other administrative agencies. Accordingly, under this standard, a reviewing court is under no statutory constraints in reversing a Tax Court order which is premised solely upon an erroneous conclusion of law. *See, e.g., Supervisor of Assess. v. Carroll,* 298 Md. 311, 469 A.2d 858 (1984); *Comptroller v. Mandel Re–Election Comm.,* 280 Md. 575, 374 A.2d 1130 (1977).

On the other hand, where the Tax Court's decision is based on a factual determination, and there is no error of law, the reviewing court may not reverse the Tax Court's order if substantial evidence of record supports the agency's decision. *See CBS Inc. v. Comptroller of the Treasury,* 319 Md. 687, 698, 575 A.2d 324, 329 (1990); *Ramsay, Scarlett & Co. v. Comptroller of the Treasury,* 302 Md. 825, 834, 490 A.2d 1296, 1301 (1985); *Rouse–Fairwood Ltd. Partnership v. Supervisor of Assessments,* 120 Md.App. 667, 685, 708 A.2d 19, 27 (1998); *see also Comptroller of the Treasury v. Disclosure, Inc.,* 340 Md. 675, 682–83, 667 A.2d 910, 913 (1995); *Director of Finance v. Charles Towers Partnership,* 104 Md.App. 710, 716–17, 657 A.2d 808, 812 (1995), *aff'd sub nom., Chesapeake & Potomac Tel. Co. v. Director of Finance,* 343 Md. 567, 683 A.2d 512 (1996).

In addition, as we stated in *Comptroller of the Treasury v. Clyde's of Chevy Chase, Inc.,* 377 Md. 471, 484, 833 A.2d 1014 (2003):

"When specifically interpreting tax statutes, this Court recognizes that any ambiguity within the statutory language must be interpreted in favor of the taxpayer. In [*Comptrol-*

*ler of the Treasury v. Gannett,* 356 Md. 699, 707–08, 741 A.2d 1130, 1135 (1999) ], we stated:

'When ambiguities arise in construing tax statutes, Maryland courts must interpret tax code provisions that aid in determining taxable income in the taxpayer's favor. We noted in *Comptroller v. John C. Louis Co.,* 285 Md. 527, 539, 404 A.2d 1045, 1053 (1979), that

"when ... the applicability of a tax statute and not a tax exemption is being construed, it is the established rule not to extend the tax statute's provisions by implication, beyond the clear import of the language used, to cases not plainly within the statute's language, and not to enlarge the statute's operation so as to embrace matters not specifically pointed out. In case of doubt, tax statutes are construed 'most strongly against the government, and in favor of the citizen.' *Comptroller of the Treasury v. Mandel Re–Election Comm.,* 280 Md. 575, 580, 374 A.2d 1130, 1132 (1977); *Comptroller of the Treasury v. M.E. Rockhill, Inc.,* 205 Md. 226, 234, 107 A.2d 93, 98 (1954)."

## III. Discussion

### A. Fixture Analysis

■ The main issue in this case, as we see it, is whether the mooring buoys used by Hartge at its marina are to be classified as "real property" or "personal property" for taxation purposes. Under Maryland Code (2001 Repl.Vol.), § 1–101(cc)(1) of the Tax–Property Article, " 'Real property' means any land or improvements to land." Because the mooring buoys at issue here are at least initially personal chattels and not in and of themselves land, the initial question becomes whether these mooring buoys are fixtures that have become "actually or constructively affixed either to the soil itself, or some structure legally a part of such soil." *Schofer v. Hoffman,* 182 Md. 270, 274, 34 A.2d 350, 351 (1943); *see also Dudley & Carpenter v. Hurst, Miller & Co.,* 67 Md. 44, 47–48, 8 A. 901 (1887) (stating the common law test for identifying

fixtures). If so, they may be considered fixtures and there-fore taxable as real property.

The fixture test, first delineated by this Court in *Dudley,* was more recently restated in *Colonial Pipeline Co. v. State Department of Assessments and Taxation,* 371 Md. 16, 806 A.2d 648 (2002). In *Colonial Pipeline,* we stated:

"The common law test for identifying fixtures considers the following factors:

'First, annexation to the realty either actual or construc-tive. Second, adaptation to the use of that part of the realty with which it is connected. Thirdly, the intention of the party making the annexation, to make the article a permanent accession to the freehold, this intention being inferred from the nature of the article annexed, the situation of the party making the annexation, the mode of annexation, and the purpose for which it was annexed.' *Dudley,* 67 Md. at 47, 8 A. at 902. An item is annexed to the land if it cannot be removed without serious injury.... The second element of the test, adaptation, is met when an item "has become an important or essential part of the land's use or enjoyment." [RICHARD R. POWELL, POWELL ON REAL PROPERTY, § 57–45 (1969)]. This test requires a relationship between the land itself and the fixture. The affixed item must be adapted to the specific use of the land for it to be characterized as a part of that land. The intent requirement, however, is "the most important," and takes preeminence over the other two factors. *Dudley,* 67 Md. at 48, 8 A. at 902.

"The common law annexation, adaptation, and intention factors as set forth in *Dudley* continue to control resolution of questions arising under the law of fixtures in Maryland."

*Colonial Pipeline,* 371 Md. at 33–34, 806 A.2d at 658–59 (alterations added) (some citations omitted).

While the *Dudley* factors do continue to control the resolution of fixture disputes, there exists an important excep-tion to this common law rule-property that can be classified as a "trade fixture." Despite its name, a trade fixture is not

actually a fixture.[8] We explained the origins of the trade fixtures exception in *Colonial Pipeline:*

> "The trade fixtures exception to the common law rule of fixtures dates back almost as far as the common law rule itself. *Van Ness v. Pacard,* 27 U.S. 137, 143–44, 2 Pet. 137, 7 L.Ed. 374, 376–77 (1829). In 1802, this Court held in *Kirwan* that 'where a tenant puts up any thing for the purpose of carrying on his trade, he may remove it.' 1 H. & J. at 291. A trade fixture commonly is defined as an item affixed to realty for the purpose of enabling the tenant to perform properly a trade or profession, which can be removed without material or permanent injury to the realty. [RICHARD R. POWELL, POWELL ON REAL PROPERTY, § 57–45 (1969)]. The touchstone for the trade fixtures test, like the *Dudley* fixtures analysis, is intent. . . . When the proper intent is found, '[n]o matter how strongly [the fixtures are] attached to the soil or imbedded in it, they are treated as personal property, and as such are subject to removal by the person erecting them.' *N. Cent. Ry. Co. v. Canton Co.,* 30 Md. 347, 352 (1869)."

*Colonial Pipeline,* 371 Md. at 34–35, 806 A.2d at 659 (some citations omitted).

■ Under the common law fixtures test, the mooring buoys at issue in the case *sub judice* are to be classified, at the most, as trade fixtures and therefore personal property for tax purposes. Mooring buoys, as attested to by both petitioner and respondents, are not permanently affixed to the river bottom, but their anchors are objects that fall to the bottom due to their sheer weight and rest on the river bottom. As was also explained, these mooring anchors are brought up from the river bottom, along with the entire buoy apparatus, by the use of a crane from time to time—approximately once every ten years—for a complete inspection to see if any

---

**8.** BLACK'S LAW DICTIONARY 652 (7th ed.1999) defines a "trade fixture" as "[r]emovable personal property that a tenant attaches to leased land for business purposes, such as a display counter. Despite its name, a trade fixture is not [usually] treated as a fixture—that is, as irremovable."

repairs are needed. As we stated in *Colonial Pipeline,* "[a] trade fixture is not annexed to the soil in the manner of a fixture because it must be removable without permanently damaging the realty; and the intent of annexing a trade fixture to the land is to benefit the business of the party annexing the fixture to the land, not the land itself." *Id.* at 38, 806 A.2d at 661. That is exactly the situation in respect to the utilization of mooring buoys described in the case at bar. The facts of the case *sub judice* do not support petitioner's argument that the mooring buoys are fixtures to be treated as the real property of Hartge. For these moorings to be properly deemed fixtures, they would have to be so affixed to the river bottom that their "removal would result in serious injury to the property." *Id.* While the anchors of the moorings are heavy enough to hold large boats in the same general place, for they would be of little use if this was not so, they can be and are periodically removed from the West River bottom without causing any damage to the river bottom. Petitioner provided no evidence to the contrary. Therefore, the nature of the mooring buoys do not meet the first prong of the fixtures test delineated in *Dudley.*

The most important element of the fixtures test at common law is the intent of the party installing the fixture. *See Colonial Pipeline,* 371 Md. at 37, 806 A.2d at 661 (stating that " '[t]he third criterion dealing with intention is preeminent, whereas the first and second criteria constitute evidence of intention.' " quoting *Lingleville Independent School Dist. v. Valero Transmission Co.,* 763 S.W.2d 616, 618 (1989)). Hartge's business intentions concerning the mooring buoys cannot be said to meet the *Dudley* elements indicating a permanent fixture. At the Tax Court hearing, a representative of Hartge stated that, once Hartge's lease of the marina expired in 2008, he would "[s]ell [the buoys], get rid of them in some way." Hartge does not intend to leave the mooring buoys in the river if it does not renew its lease in the future, nor will the moorings, absent a purchase agreement, belong to Whitestake after the lease terminates. Such intent cannot be said to

reflect the desire "to make the article a permanent accession" to the river bottom. *Dudley,* 67 Md. at 47, 8 A. at 902.

Here, the obvious purpose for the installation of the mooring buoys was to generate rent for Hartge's marina operation. This rent is part of the overall income generated by the marina. In deciding that a fixture had been designed for trade purposes, this Court in *Colonial Pipeline* reasoned that a utility pipeline was used for trade purposes because the owner was "motivated by a single factor in installing the pipeline system: to operate its business for profit." *Colonial Pipeline,* 371 Md. at 39, 806 A.2d at 661. Like the utility pipeline in that case, we find no other evidence in the record that the mooring buoys were installed for any other purpose than to provide a means for Hartge to benefit economically. The mooring buoys do not meet the elements of fixtures under the *Dudley* test. At most, they fall within the trade fixtures exception that we discussed in *Colonial Pipeline.* The very reasons that the mooring buoys fail the *Dudley* fixtures analyses are why they may be considered trade fixtures—the mooring buoys are not affixed to the soil, they exist simply to provide marina users a service that Hartge directly profits from, and Hartge never intended for the mooring buoys to permanently remain on the West River bottom and they may be removed at any time without damage to the bottom of the watercourse. As such, the mooring buoys, at best, are properly classified as trade fixtures and therefore are to be considered personal property for tax purposes.

### B. Applicability of § 6–102(e)

Petitioner contends that the mooring buoys should be classified as real property for taxation purposes because of the language of Md.Code (2001 Repl.Vol.), § 6–102(e) of the Tax–Property Article. Section 6–102(e) of the Tax–Property Article states:

"(e) *Interests in government property.*—Unless exempted under § 7–211, § 7–211.1, or § 7–501 of this article, the interest or privilege of a person in property that is owned by the federal, the State, a county, or a municipal corpora-

tion government is subject to property tax as though the lessee or the user of the property were the owner of the property, if the property is leased or otherwise made available to that person:

(1) by the federal, the State, a county, or municipal corporation government; and

(2) with the privilege to use the property in connection with a business that is conducted for profit."

■■■ As is evident, the statute merely defines the taxable interest as a "property" interest. In the case at bar that taxable property interest is a personal property interest in that, even if the river bottom was owned by a private party the mooring buoys would be, at the most, "trade fixtures" and not fixtures. If they were owned by a private party for personal, not commercial, use, they would not normally even be "trade fixtures."

It is without question that "nearly all of the navigable waters, *as well as the lands beneath them,* are owned by the State. . . ." *Harbor Island Marina v. Board of County Commr's,* 286 Md. 303, 314, 407 A.2d 738, 744 (1979) (emphasis added). Therefore, generally, any use of three or more mooring buoys on the West River bottom by a single private commercial entity such as Hartge must first be registered with the appropriate State authority. Here, that State authority exists in the form of the Maryland Department of Natural Resources ("DNR").[9] Under COMAR 08.04.13.03(A), "[a] person may not establish a group mooring unless validly registered with the [DNR] or a designated local government authority." As noted, Hartge first registered its group moorings with the DNR in September of 1989.

---

**9.** This authority stems from Md.Code (1973, 2000 Repl.Vol., 2003 Supp.), § 8–704(b) of the Natural Resources Article, which states:

"(b) *Placement of buoys, mooring buoys, etc.*—In order to protect the public safety, welfare, and recreational interests in waters of the State, the Department may adopt a program relating to the placement of buoys, mooring buoys, and other apparatus used to secure, berth, or moor vessels in the waters of the State. The Department shall consult with any county affected by the program."

When determining the relevance of § 6–102(e) and whether it applies to mooring buoys, it is of some interest to also note the language of COMAR 08.04.13.06, which states that "[t]he placement of a mooring pursuant to these regulations *does not create a property right or an exclusive privilege....*" (emphasis added). This language, in and of itself, although not determinative, would seem to indicate that the agency does not consider that Hartge's mere use of the river bottom for its mooring buoys creates real property rights so as to be taxable to Hartge under § 6–102(e). There exists for Hartge no deed, lease, or easement to the river bottom. It has at most a mere certificate in the nature of a license. It is the apparent intention of the State that mooring "licenses" create no property rights under the law of real property. Petitioner argues, nonetheless, that the language in § 6–102(e) is so expansive that *any* type of use by a private commercial entity of State-owned property makes that commercial entity subject to taxation of the State property as if it was real property under § 6–102(e). We do not agree.

In submitting registration documents relating to its mooring buoys to the DNR, Hartge did not obtain any property rights in or exclusive privilege to use the State-owned river bottom or any right to affix a "fixture," as that term is defined by the law of real property. It is illogical that Hartge should be taxed under a real property tax assessment under a statutory and regulatory scheme that expressly provides that it does not create property rights. This is especially so when any ambiguity in the statute or regulation must be construed in favor of the taxpayer.

 We agree with the Circuit Court in its conclusion that what Hartge does possess is a renewable license to place moorings in the West River, provided that Hartge meets the requirements of the DNR's group moorings program. As this Court has stated, "a license is merely a privilege to do some particular act or series of acts on land without possessing any estate or interest therein." *Condry v. Laurie,* 184 Md. 317, 320, 41 A.2d 66, 68 (1945). *See also Hess v. Muir,* 65 Md. 586,

600, 5 A. 540, 543–44 (1886) (holding that "the privilege of locating oyster lots [on State-owned river bottom] has no elements of a grant by patent, but is simply a license, revocable at the pleasure of the Legislature . . . .") (alteration added).

Most pertinent in our conclusion that § 6–102(e) does not have the effect of making Hartge's mooring buoys real property for taxation purposes is that, even if Hartge, the "user" of the property, "were the owner of the property," as is theorized under § 6–102(e), we would still find that the mooring buoys cannot be viewed as fixtures to the West River bottom and, as such, are not taxable as real property. The *Dudley* fixtures test places no weight on whether the owner of the items at issue is the owner or lessee of the land on which they are placed. The fixtures test simply determines what is and what is not to be considered a fixture. Here, if Hartge was *in fact* the owner of the river bottom on which the moorings sit, this would in no way alter the conclusion that the characteristics of the mooring buoys make them personal property. Therefore, § 6–102(e) has no legitimate bearing on the classification of Hartge's mooring buoys. They are personal property, for they do not meet the elements of the *Dudley* fixtures test, and the language of § 6–102(e) does nothing to alter this conclusion.

## IV. Conclusion

We hold that the mooring buoys owned by Hartge Yacht Yard, Inc. are, at best, trade fixtures and, therefore, are properly taxable, if at all, only as personal property. The moorings are not permanently affixed to the West River bottom, their purpose is to provide a means by which Hartge can generate a profit from their rental, and they are not intended to permanently remain on the river bottom and if removed cause no permanent damage. As such, they do not meet the definition of a "fixture" as delineated by this court in *Dudley*. They may, however, meet the definition of "trade fixtures" that this Court recently discussed in *Colonial Pipeline* and might be taxable accordingly.

We hold that the Maryland Tax Court erred as a matter of law when it concluded that the mooring buoys used by Hartge in its marina operation were to be classified as real property for taxation purposes under § 6–102(e) of the Tax–Property Article. While the moorings' anchors do rest on the bottom of the West River, which is State-owned land, Hartge's mere use of this river bottom creates no real property rights, interests, or privileges so as to be taxable as real property under § 6–102(e). This is made clear from the language of COMAR 08.04.13.06. Hartge's registration of its group mooring with the DNR under COMAR 08.04.13.03 creates, at best, merely a license, renewable every three years. As such, Hartge cannot be said to have a right, interest, or privilege to the river bottom as required under § 6–102(e) for real property taxation purposes.

Furthermore, and most importantly, § 6–102(e), as presently written, has little bearing in resolving this issue because, even if Hartge were the owner of the river bed, this Court would still hold that the mooring buoys at issue are not fixtures under the law of real property and absent clear and express statutory language to the contrary are, at best, to be considered trade fixtures, *i.e.*, personal property. The mooring buoys cannot be considered fixtures under the *Dudley* fixtures test. Theoretical ownership by Hartge of the river bottom, as § 6–102(e) posits, would do nothing to change this holding. The mooring buoys would remain classified as personal property and, under the language of the statute would be so considered for taxation purposes.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED; PETITIONER TO PAY THE COSTS.**