918 A.2d 514

**COMPTROLLER OF the TREASURY**

v.

**COLONIAL FARM CREDIT, ACA.**

No. 2439, Sept. Term, 2005.

Court of Special Appeals of Maryland.

March 12, 2007.

Gerald Langbaum (John K. Barry, J. Joseph Curran, Jr., Atty. Gen., on brief), for appellant.

Herman B. Rosenthal, Baltimore, Theodore R. Bots, Chicago, IL, for appellee.

Panel MURPHY, C.J., KENNEY and MEREDITH, JJ.

KENNEY, J.

The Comptroller of the Treasury, appellant, denied claims for refunds in amended tax returns filed by Colonial Farm Credit, ACA,[1] appellee, and the Maryland Tax Court affirmed that decision. After the Circuit Court for Baltimore City reversed the Maryland Tax Court, the Comptroller noted this appeal and presents one question:

> Did the Circuit Court for Baltimore City err in concluding that a settlement reached between Colonial and the Internal Revenue Service, which provided that 60% of Colonial's income from certain long-term real estate mortgage loans was exempt from tax, was binding on the Comptroller for determining Maryland taxable income for state income tax purposes?

Colonial states the question somewhat differently:

> Whether the Circuit Court correctly determined that Colonial's federal taxable income, as finally determined pur-

---

1. "ACA" is an abbreviation for "Agricultural Credit Association," discussed *infra*.

suant to IRC § 7121 Closing Agreements On Final Determinations Covering Specific Matters, serves as Colonial's federal taxable income for Maryland income tax purposes pursuant to MD Code Ann., Tax–Gen. §§ 10–304 and 10–107.

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

The facts of this case are undisputed.[2] A corporation's Maryland income tax liability is based on its "federal taxable income for the taxable year as determined under the Internal Revenue Code." Md.Code (1988, 2004 Repl.Vol.), § 10–304(1) of the Tax–General Article ("Tax–Gen."). In 2002, Colonial filed amended Maryland tax returns for 1991 and 1993–2000 on the ground that it had reached an agreement with the Internal Revenue Service that its federal taxable income for those years was lower than originally reported. In a letter dated November 6, 2002, the Comptroller denied Colonial's amended returns. Colonial filed a protest, and an informal hearing was held on January 23, 2003. The Comptroller affirmed its denial in a Notice of Final Determination dated March 31, 2004. Colonial appealed the Comptroller's decision to the Maryland Tax Court.

After a hearing on December 8, 2004, the Tax Court affirmed the Comptroller's denial of the amended tax returns. Colonial petitioned for judicial review in the Circuit Court for Baltimore City. After a hearing, the court reversed the decision of the Tax Court. Thereafter, the Comptroller noted this timely appeal.[3] Additional facts will be provided as necessary for our discussion of the issues.

---

**2.** The parties presented a joint stipulation of facts before the Tax Court, which serves as a basis for our statement of the factual history.

**3.** Colonial noted a cross-appeal on January 13, 2006. It presents the following question:

## STANDARD OF REVIEW

"The scope of our review is substantially the same as that of the circuit court. That is, we review the Tax Court's decision and not the decision of the circuit court." *Pleasants Investments Ltd. P'ship v. State Dept. of Assessments & Taxation,* 141 Md.App. 481, 489, 786 A.2d 13 (2001). "[A] reviewing court is under no statutory constraints in reversing a Tax Court order which is premised solely upon an erroneous conclusion of law." *Supervisor of Assessments of Anne Arundel County v. Hartge Yacht Yard, Inc.,* 379 Md. 452, 461, 842 A.2d 732 (2004). "On the other hand, where the Tax Court's decision is based on a factual determination, and there is no error of law, the reviewing court may not reverse the Tax Court's order if substantial evidence of record supports the agency decision." *Id.* The Court of Appeals has explained that, under this standard of review, "our scope of review remains narrow if a reasoning mind could have reached the Tax Court's conclusion based on the evidence. We will not broaden our scope of review and overturn the Tax Court's decision unless it was based on an error of law." *Dept. of Assessments & Taxation v. Consol. Coal Sales Co.,* 382 Md. 439, 455, 855 A.2d 1197 (2004).

---

Alternatively, if Colonial's federal taxable income as finally determined pursuant to IRC § 7121 Closing Agreements On Final Determination Covering Specific Matters does not represent Colonial's federal taxable income for Maryland income tax purposes, whether pursuant to MD Code Ann., Tax–Gen. § 10–107 Colonial's federal taxable income, for Maryland income tax purposes, must be computed in accordance with an existing judicial determination regarding the federal taxation of an Agricultural Credit Association's long-term mortgage lending income, thereby giving rise to a greater refund to Colonial than would be the case pursuant to the Circuit Court's decision.

" 'It is established as a general principle that only a party aggrieved by a court's judgment may take an appeal and that one may not appeal or cross-appeal from a judgment wholly in his favor.' " *Wolfe v. Anne Arundel County,* 374 Md. 20, 26 n. 2, 821 A.2d 52 (2003) (quoting *Offutt v. Montgomery County Bd. of Educ.,* 285 Md. 557, 564 n. 4, 404 A.2d 281 (1979)). Because the judgment of the circuit court was wholly in Colonial's favor, it is not entitled to cross-appeal. We view the cross-appeal as an alternative argument for affirmance.

## DISCUSSION

### Agricultural Credit Associations

Colonial is an Agricultural Credit Association within the federal "Farm Credit System," which was created by Congress in 1916. It serves the purpose "of improving the income and well-being of American farmers and ranchers by furnishing sound, adequate, and constructive credit and closely related services to them, their cooperatives, and to selected farm-related businesses necessary for efficient farm operations." 12 U.S.C.A. § 2001(a). In response to economic difficulties in the 1980s, Congress enacted the Agricultural Credit Act of 1987 "to provide credit assistance to farmers, to strengthen the Farm Credit System, to facilitate the establishment of secondary markets for agricultural loans, and for other purposes." Act of Jan. 6, 1988, Pub.L. No. 100–233, 101 Stat. 1568.

Among other things, the Act provided for voluntary "Merger of Like and Unlike Associations" within the Farm Credit System. *Id.* at § 416. Under 12 U.S.C.A. § 2279c–1(a), "[t]wo or more associations within the same district . . . may merge into a single entity," if the merger is approved by the Farm Credit Administration Board, the boards of directors of the merging associations, the majority of the shareholders of each association, and the Farm Credit Bank. The resulting association is known as an "Agricultural Credit Association" ("ACA"). *See, e.g.,* 12 C.F.R. § 611.1040.

Among the associations within the Farm Credit System are Federal Land Bank Associations ("FLBAs") and Production Credit Associations ("PCAs"). The principal function of FLBAs is to facilitate long term real estate mortgage loans from Farm Credit Banks, 12 U.S.C.A. § 2093, and they are exempt from federal and state income taxation, 12 U.S.C.A. § 2098. The general purpose of PCAs is to "make, guarantee, or participate with other lenders in short- and intermediate-term loans and other similar financial assistance" to qualified agriculture-related borrowers. 12 U.S.C.A. § 2075. PCAs are not tax exempt. 12 U.S.C.A. § 2077.

FLBAs and PCAs can merge under 12 U.S.C.A. § 2279c–1 to create an ACA. "The idea [of the Agricultural Credit Act of 1987] was to streamline the System, reduce costs and increase efficiency, and ultimately to assist member institutions to provide competitive interest rates. Thus a PCA and an FLBA could merge, creating an ACA, and offer short, intermediate and long-term loans within its chartered territory." *Buckeye Production Credit Ass'n v. Farm Credit Admin.*, 997 F.2d 11, 13–14 (4th Cir.1993) (citations omitted). Colonial was formed in 1989 through the merger of The Colonial, PCA, and Colonial, FLBA.

With respect to the nature of ACAs, 12 U.S.C.A. § 2279c–1(b) states: "Except as otherwise provided by this subchapter, a merged association shall—(A) possess all powers granted under this chapter to the associations forming the merged association; and (B) be subject to all of the obligations imposed under this chapter on the associations forming the merged association." Thus, an ACA may continue to conduct the transactions that were previously conducted by the various associations that were merged to form the ACA.

After the creation of ACAs by Congress, disputes arose between ACAs and the Internal Revenue Service ("IRS") regarding whether lending activities that would have previously been conducted by FLBAs remained tax exempt after the merger of an FLBA into an ACA. In *United States v. Farm Credit Servs. of Fargo, ACA,* 89 A.F.T.R.2d (R.I.A.) 2002–334–36 (1998), the United States District Court for the District of North Dakota considered one such dispute. Fargo had paid income taxes on all of its lending activities, but then sought a refund of taxes paid on lending activities that would have previously been performed by the merged FLBA. The IRS initially granted the refund, but later requested repayment, leading to the litigation before the federal district court. The court concluded that the lending services at issue are tax exempt:

> 12 U.S.C. § 2098 specifically grants an income tax exemption to FLBAs whose income is derived from providing and servicing long term real estate loans. This Court holds that

this exemption from taxation applies equally to the restructured Fargo–ACA which has been formed by merger pursuant to 12 U.S.C. § 2279c–1. Fargo–ACA is merely the continuation of the local FLBA and PCA with identical powers and obligations.

Section 2279c–1 provides that the restructured ACA shall "possess all powers granted under this chapter," and likewise is "subject to all the obligations imposed under this chapter on the Associations forming the merged association." Since no corporate powers or obligations unique to the ACA are provided, it is obvious that the ACA can only function under the auspices of the incorporated sections of the chapter explicitly referenced, specifically those sections applicable to the pre-merger entities. This would clearly include the taxation provisions for FLBAs pursuant to 12 U.S.C. § 2098.

To conclude that Congress intended to deny the continuance of the exemption from federal income tax on income earned from long term lending activities, which has been exempt since 1916, would be illogical and absurd. *See* The Federal Farm Loan Act, Pub.L. No. 158, § 26, 39 Stat. 360, 380 (1916). This is especially so upon a simple reading of the Act of 1987: Congress means to provide financial assistance to the agricultural industry, not create obstacles.

*Fargo,* 89 A.F.T.R.2d at 2002–336–37.

According to Colonial, the *Fargo* decision resulted in "closing agreements" between the IRS and all ACAs as to the taxable income for FLBA-like lending activities for certain years. The IRS entered into a closing agreement with Colonial, which entitled Colonial to a refund of 60% of its "long-term taxable income" for the years 1991 and 1993–1999, and a second closing agreement to the same effect for the year 2000. Those closing agreements, which adjusted Colonial's federal taxable income for the years at issue, are the basis for Colonial's contention that it is entitled to a refund of state income taxes for the years at issue.

## State Income Tax

Maryland income tax liability is dependent, to some extent, on the taxpayer's federal income tax liability. Tax–Gen. § 10–107 provides that, "[t]o the extent practicable, the Comptroller shall apply the administrative and judicial interpretations of the federal income tax law to the administration of the income tax laws of this State." With respect to state corporate income tax, Tax–Gen. § 10–301 provides: "The Maryland taxable income of a corporation is its Maryland modified income as allocated to the State under Subtitle 4 of this title." Tax–Gen. § 10–304 states:

Except as provided in Subtitle 4 of this title, the Maryland modified income of a corporation, including a real estate investment trust or regulated investment company, is:

(1) the corporation's federal taxable income for the taxable year as determined under the Internal Revenue Code and as adjusted under this Part II of this subtitle. . . .

■ The Court of Appeals has explained the doctrine of conformity between state and federal tax law as follows:

[T]he whole thrust of the Maryland Act is to impose a tax on the amount determined under the Internal Revenue Code as the adjusted gross income of an individual or the taxable income of a corporation. This is a formula or yardstick objectively derived which initially takes no account of the source, nature or composition of the funds; it is simply a figure developed by the federal return.

*Katzenberg v. Comptroller of Treasury,* 263 Md. 189, 204–205, 282 A.2d 465 (1971). As a result, "[w]hereas federal law must enumerate and define items of income in a wide variety of factual situations, Maryland law, by virtue of its adoption of the federal law, need not." *Comptroller of the Treasury v. Chesapeake Corp. of Virginia,* 54 Md.App. 208, 214, 458 A.2d 459 (1983). "[T]he essential, initial determination which must be made before a corporation may be subjected to Maryland tax is whether that corporation has federal taxable income" and the amount of that taxable income. *Ford Motor Land*

*Dev. Corp. v. Comptroller of Treasury,* 68 Md.App. 342, 353, 511 A.2d 578 (1986).

■ Nevertheless, Maryland tax law looks only to the total federal taxable income generated on the federal tax return, without regard to other aspects of federal law that might ultimately affect the taxpayer's federal tax liability. For example, the "taxable income" figure cannot be modified for Maryland tax purposes based on federal tax breaks. *Marco Assocs. v. Comptroller of the Treasury,* 265 Md. 669, 291 A.2d 489 (1972). In Marco, which was decided before Maryland recognized Subchapter S corporations, the Court of Appeals held that Marco Associates could not deduct from its state taxable income the amount of its income that, under federal tax law, "passed through" to its shareholders. The Court reasoned:

> [The] focus [of Maryland income tax law] is on the taxable income of a corporation, or the adjusted gross income of an individual, as the same is developed in the taxpayer's federal income tax return, subject to the modifications permitted by the Act, whether a federal tax is or is not generated by the return.

> The fact that a gain recognized by a Subchapter S corporation and reflected in its taxable income may be attributed to the corporation's shareholders under federal law does not alter the fact that it remains within the concept of taxable income under the Act—a figure upon which the Maryland tax is based.

*Id.* at 678, 291 A.2d 489.

Similarly, in *NCR Corp. v. Comptroller of the Treasury,* 313 Md. 118, 544 A.2d 764 (1988), the Court of Appeals held that NCR was not permitted to deduct certain amounts from its taxable income that had been added to the income figure for federal income tax purposes only. NCR had claimed credits on its federal income tax return for foreign taxes paid by its foreign subsidiaries. The credits appeared on its federal return as "grossed-up" dividend income. The Court of Ap-

peals concluded that NCR was not entitled to deduct the "grossed-up" dividend income from its state taxable income:

As we have seen, § 280A(a) instructs, as it did in 1976, that "[t]he net income of a corporation shall be the taxable income of such taxpayer as defined in the laws of the United States ... for the corresponding taxable period...." The purpose of that provision is "to bring the State taxation system in conformity with the federal scheme." *Comptroller v. American Satellite Corp.*, 312 Md. 537, 545, 540 A.2d 1146, 1150 (1988). Since NCR's 1976 federal taxable income included the gross-up, and since the Maryland statutes applicable to 1976 contained no authority to adjust or deduct that figure, it should, one would think, be included in Maryland taxable income.

*NCR Corp.*, 313 Md. at 123, 544 A.2d 764.

On the other hand, the Comptroller is not required to accept the federal taxable income figure provided on a taxpayer's federal tax return merely because that figure was accepted by the IRS. To the contrary, the doctrine of conformity presupposes a truthful and accurate federal taxable income figure: "Obviously the Maryland law contemplates the truthful reporting of income on the federal return; otherwise a defrauding taxpayer, while subject to federal prosecution, would escape state prosecution, a result hardly contemplated by the legislature." *Winters v. State*, 301 Md. 214, 236, 482 A.2d 886 (1984).

■ The Comptroller therefore has the authority to adjust a taxpayer's taxable income to ensure that it is truthful and accurate under the IRC:

If a taxpayer failed to report certain income on its federal tax return that the I.R.C. mandated it to report, and the IRS accepted that figure, [the Comptroller] should be permitted to recalculate the Maryland modified income because the federal taxable income figure it relies on would be incorrect. Likewise, if the IRS exercised its discretion to create mandatory regulations that required the taxpayer to report certain income, and the taxpayer failed to do so, [the Comptroller] could follow those IRS regulations in recalcu-

lating the Maryland modified income. In both cases, the statute or regulation are rigid and objective in their determination of what is taxable income. If we were to hold that [the Comptroller] could never apply such provisions, then taxpayers who evade their federal income taxes would be free, without considering criminal sanctions, to evade their Maryland income tax obligation as well. We should not attribute such an illogical intent to the Legislature's 1967 revision of the state tax code.

*Comptroller of the Treasury v. Gannett Co.*, 356 Md. 699, 716, 741 A.2d 1130 (1999) (footnote omitted). In *Gannett,* the Comptroller had argued that he had authority to make a discretionary determination to impute to a parent company certain interest income from intercompany accounts with its subsidiaries because the Secretary of the IRS has such authority under the IRC. The Court held that, although the Comptroller may enforce mandatory reporting requirements under the IRC, he may not exercise discretionary authority under the IRC. *Id.* at 719–20, 741 A.2d 1130.

### Closing Agreements

There are two methods by which a taxpayer may enter into a binding agreement with the IRS on a disputed issue: (1) a closing agreement under 26 U.S.C.A. § 7121, or (2) a compromise under 26 U.S.C.A. § 7122. *Matter of Avildsen Tools & Machine, Inc.,* 794 F.2d 1248, 1253 (7th Cir.1986); *Combs v. United States,* 790 F.Supp. 850, 852 (S.D.Ind.1992); Jacob Mertens, Jr., *Law of Federal Income Taxation* § 54:135 (Supp.2006). 26 U.S.C.A. § 7121 provides:

(a) Authorization.—The Secretary is authorized to enter into an agreement in writing with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect of any internal revenue tax for any taxable period.

(b) Finality.—If such agreement is approved by the Secretary (within such time as may be stated in such agreement, or later agreed to) such agreement shall be final and

conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact—

(1) the case shall not be reopened as to the matters agreed upon or the agreement modified by any officer, employee, or agent of the United State, and

(2) in any suit, action, or proceeding, such agreement, or any determination, assessment, collection, payment, abatement, refund, or credit made in accordance therewith, shall not be annulled, modified, set aside, or disregarded.

■ "A closing agreement is a written contract between the taxpayer and the Secretary of the Treasury." *States S.S. Co. v. I.R.S.*, 683 F.2d 1282, 1284 (9th Cir.1982). "In applying § 7121, courts unanimously have held that closing agreements are meant to determine finally and conclusively a taxpayer's liability for a particular tax year or years." *In re Hopkins*, 146 F.3d 729, 732 (9th Cir.1998).

A closing agreement is a written agreement between an individual and the Commissioner that settles or "closes" an individual's liability for taxes during the period governed by the agreement. If the document is signed by an individual and accepted by the Commissioner, then it is final, conclusive, and binding upon both the taxpayer and the IRS, for the purpose of the agreement is to terminate and dispose of tax controversies once and for all.... In other words, the execution of a closing agreement resolves the underlying controversy and moots the case absent a showing of "fraud, malfeasance, or misrepresentation of a material fact." 26 U.S.C. § 7121(b).

*S&O Liquidating P'ship v. C.I.R.*, 291 F.3d 454, 458 (7th Cir.2002) (other citations omitted). *Accord In re Miller*, 174 B.R. 791, 796 (9th Cir.BAP1994); *In re Guyana Dev. Corp.*, 168 B.R. 892, 909–10 (Bankr.S.D.Tex.1994).

The subject of a closing agreement "may relate to any Internal Revenue tax including income, excess profits, excise, estate and gift, employment, and social security taxes[;] ... may be between the Service and any taxpayer[;] ... [and]

may relate to any taxable period including a past taxable year or part of a year, or an open taxable year." Mertens, *supra,* at § 52:07. The terms of a closing agreement are interpreted according to the general principles of contract law. *Smith v. United States,* 850 F.2d 242, 245 (5th Cir.1988); *Rink v. C.I.R.,* 100 T.C. 319, 325, 1993 WL 101372 (1993).

As for compromises, 26 U.S.C.A. § 7122(a) provides that the IRS "may compromise any civil or criminal case arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense; and the Attorney General or his delegate may compromise any such case after reference to the Department of Justice for prosecution or defense." 26 U.S.C.A. § 7122(c)-(d) provides for submissions of offers-in-compromise and evaluation of such offers. "A compromise is a settlement of a criminal or civil case involving taxes, interest, penalties and additions to tax. . . ." Mertens, *supra,* at 54:135.

A compromise is employed in situations where:

1. the taxpayer is unable to pay the full amount of his tax liability;

2. there is doubt regarding the liability of the taxpayer; or

3. collection would create economic hardship or exceptional circumstances exist such that collection would be detrimental to voluntary compliance.

*Id.* at § 52:06.

The statutory language demonstrates the distinction between the purpose and legal effect of a closing agreement, "an agreement in writing with any person relating to the liability of such person . . . in respect of any internal revenue tax for any taxable period," 26 U.S.C.A. § 7121(a), and a compromise of a "civil or criminal case arising under the internal revenue laws," 26 U.S.C.A. § 7122(a).

The difference between a compromise and a closing agreement is that a closing agreement is a settlement of disputed questions of law or fact, whereas a compromise involves the acceptance of a sum of money less than the total tax liability

due from a taxpayer by the Service regardless of whether the tax liability is disputed or not.

Mertens, *supra*, at § 52:06.

We have not been directed to, nor have we found, any Maryland appellate cases addressing the effect of a closing agreement on a taxpayer's state tax liability.[4]

### Colonial's Taxable Income

The first closing agreement between the IRS and Colonial states, in relevant part:

WHEREAS, Federal Land Bank Associations ("FLBAs"), the historic long-term lending institutions of the Farm Credit System, are exempt from Federal income tax, while Production Credit Associations ("PCAs"), the historic short and intermediate lending institutions of the Farm Credit System, are subject to Federal income taxation;

WHEREAS, as a result of the provisions of the Agricultural Credit Act of 1987, which authorized the merger of

---

4. In a recent Maryland Tax Court case, *Posner v. Comptroller of the Treasury*, No. 05–EI–OO–0097, 2006 WL 2129968 (Md. Tax Ct. June 29, 2006), the estate of Rose B. Posner appealed the denial of a claim for interest on an estate tax refund granted by the Comptroller. The Tax Court noted that, under Tax–Gen. § 13–603, interest must be paid on an estate tax refund beginning on the 45th day after the refund claim is filed. Tax–Gen. § 13–901(d)(1)(i) states: "A claim for refund of Maryland estate tax . . . may be filed by a claimant required to pay the tax if: (1) the Maryland estate tax is decreased as a result of: (i) a decrease in the federal estate tax on the estate . . . ." The Tax Court stated that a claim may be filed only after there has been a definitive decrease in the federal estate tax, and opined that such a decrease may be established by a closing agreement:

> In fact, a claim may be filed only if the federal estate taxes actually decreased. The Respondent is not allowed to anticipate what the federal determination of any proposed decrease of federal estate tax may be. There must be a definitive determination by a court case or a Closing Agreement which finally determines the actual decrease of federal estate tax. Until a final determination is made, any claim would be an estimated amount and there could be no final determination of whether the federal estate tax was actually decreased.

Posner at *2. This statement by the Tax Court supports the position taken by the circuit court in this case that closing agreements are binding determinations of federal taxable income.

PCAs and FLBAs into entities called Agricultural Credit Associations ("ACAs"), several PCAs and FLBAs have merged to form ACAs;

WHEREAS, the taxpayer is an ACA;

WHEREAS, a dispute exists between the parties to this agreement whether the taxpayer's taxable income from long-term real estate mortgage loans and financial related services is exempt from Federal income tax ("the exempt income issue");

WHEREAS, another ACA has restructured its operations by forming a Federal Land Credit Association ("FLCA"), which was determined to be a Federal Land Bank Association;

WHEREAS, the Internal Revenue Service has determined that the FLCA is exempt from Federal income tax under section 501(a) of the Internal Revenue Code as an organization described in section 501(c)(1); and

WHEREAS, the taxpayer may restructure its operations in a similar manner so that the FLCA it forms may be exempt from Federal income tax under section 501(a) of the Internal Revenue Code as an organization described in section 501(c)(1).

NOW IT IS HEREBY DETERMINED AND AGREED for Federal income tax purposes that:

(1) For the purposes of this agreement, subject to the provisions of the Internal Revenue Code of 1986, the taxable income in dispute is defined as income from long-term real estate loans and financial related services less allocable expenses and is hereinafter called "long-term taxable income."

(2) The taxpayer's taxable income (without regard to any claims filed on the exempt income issue) is decreased in the following amounts to exclude sixty (60) percent of its long-term taxable income for the following taxable periods:

| Taxable Period Ending | Amount |
|---|---|
| December 31, 1991 | $1,319,262.00 |
| December 31, 1993 | $1,522,876.00 |
| December 31, 1994 | $1,661,186.00 |
| December 31, 1995 | $2,428,670.00 |
| December 31, 1996 | $2,910,727.00 |
| December 31, 1997 | $2,278,341.00 |
| December 31, 1998 | $ 441,268.00 |
| December 31, 1999 | $ 703,697.00 |

The second closing agreement is largely identical to the first. Paragraph two of the second agreement provides:

(2) The taxpayer's taxable income is decreased in the following amounts to exclude sixty (60) percent of its long-term taxable income for the following taxable periods:

| Taxable Period Ending | Amount |
|---|---|
| December 31, 2000 | $1,240,880.00 |

Both closing agreements include the following paragraph: "(5) For taxable periods beginning January 1, 2001, and thereafter, the taxpayer's long-term taxable income is subject to Federal income tax."

As it did before the Tax Court, Colonial contends that the closing agreements or, alternatively, the *Fargo* decision, constitute a binding determination of its taxable income under the IRC, which is the correct basis for its Maryland income tax liability for the years at issue. The Tax Court concluded that the closing agreements are merely the result of negotiations between Colonial and the IRS to settle a dispute over Colonial's federal tax liability, and that they do not establish Colonial's federal taxable income for purposes of its state income tax:

[C]ounsel for the Petitioner takes the position that the Closing Agreement that was entered into with the Internal Revenue Service is a final determination. I do not agree with that. I think that the Closing Agreement is, for all intents and purposes, a settlement agreement. . . . In other words, the Taxpayer took a position with the I.R.S., and the I.R.S. took a position on behalf of the I.R.S. And, apparently, there were extensive negotiations in connection with this matter. . . . It was give and take.

Another thing that influences me ... in connection with the decision [at] which I have arrived today, is that when one looks at the Closing Agreement, and specifically to paragraph 5 .... [the] Closing Agreement makes it abundantly clear that [the] credits for an exemption and what have you is not going to happen after January 1 of 2001.

Now, again, when I look at ... [Tax–Gen. §] 10–107, I find that [the closing agreement], in this Court's opinion, ... does not fall within the definition of what the Comptroller is obligated to follow in connection with the interpretation of what is taxable from the standpoint of the Comptroller's Office under Maryland law.

The Tax Court later noted that a closing agreement with the IRS applies to "a factual situation" in "one case" concerning "one given set of facts," and it is "not of such a nature that it applies to each and every taxpayer that may fall into that category at some future time."

The Tax Court also rejected Colonial's contention that *Fargo* established that FLBA-like lending activities by an ACA are tax exempt:

I realize that *[Fargo]* is a Federal District Court decision; but, number one, I find, as a matter of law, that the Maryland Tax Court is not bound by that particular decision. In other words, as I would understand the law, there can be circumstances under which that decision would not bind federal courts even in other areas of the country that were not in that particular district.

[Moreover,] it seems to me that whoever wrote [the *Fargo]* opinion did not fully understand the principles of law involved in connection with a case of [that] nature.... In essence, what the law says is that when it comes to exemptions they have got to be very clearly stated and if they're not very clearly stated and the court has any doubt about it at all, the court is obligated on a judicial finding to deny the exemption....

Now, everyone agrees, as I see it, that there is no specific statute that grants this exemption.... [The *Fargo* judge]

premised his decision on [the statute providing that ACAs] have all the powers and authorities and what have you of the former Federal Land Bank [Associations,] and because of that they get this exemption because Congress never specifically took it away. And that, to me, it not only flies in the face of sound judicial judgment, but it flies in the face of, really, logic, as far as I'm concerned. . . . *[Fargo]* says the exemption is explicit, [but] it's not.

The circuit court found that a closing agreement with the IRS is a unique resolution of a tax dispute distinct from a mere settlement agreement. The court concluded that a closing agreement is authoritative as to a taxpayer's taxable income and is therefore binding on the Comptroller for purposes of state income tax liability.

The Comptroller argues on appeal that the Tax Court correctly characterized the closing agreements as "settlement[s]" between Colonial and the IRS. According to the Comptroller, the doctrine of conformity is based on "the objectivity of the Internal Revenue Code as a measurement or yardstick," rather than "the subjective give and take" of "negotiated settlements and compromises." The Comptroller notes that the 60% credit to Colonial is not specifically provided for in the IRC and contends that it is therefore not binding on Maryland. He also argues that a decision to the contrary would mean that "the Comptroller is locked in to each and every federal settlement and the Comptroller's authority to audit and assess is lost."

Colonial responds that "the Comptroller is bound by the definition of Colonial's federal taxable income as set forth in the Closing Agreements." It assures us that a decision in its favor would not unduly limit the Comptroller's ability to "audit and assess." Alternatively, Colonial contends that, because Tax–Gen. § 10–107 requires the Comptroller to "apply the administrative and judicial interpretations of the federal income tax law to the administration of the income tax laws of this State," the Comptroller is bound by *Fargo.*

The starting point for determining a corporation's state income tax liability is "the corporation's federal taxable income for the taxable year as determined under the Internal Revenue Code." Tax–Gen. § 10–304(1). In this case, the Internal Revenue Code does not clearly establish Colonial's federal taxable income. The ambiguity regarding whether an ACA's long-term lending activities are subject to federal taxation is the dispute that led to the closing agreements. The Comptroller points out that Colonial has no clear statutory basis for arguing that only 60% of its income from long-term lending is taxable. But, by the same token, the Comptroller has no statutory basis for contending that 100% of that income is taxable. The IRS entered into closing agreements with Colonial, which established its federal taxable income for the years at issue. The closing agreements state that "[t]he taxpayer's taxable income ... is decreased" by the various amounts provided for. The agreements are "final and conclusive" determinations of Colonial's federal taxable income for the years 1991 and 1993–2000. 26 U.S.C.A. § 7121(b). As such, they establish its federal taxable income for purposes of state income taxation.

 The Comptroller fears that he will now be "locked in to each and every federal settlement" and his "authority to audit and assess is lost." We believe that fear is unfounded. Tax–Gen. § 10–304(1) is not so rigid as to "lock" the Comptroller into taxing an income figure merely because that figure is reported on the taxpayer's federal return. Rather, the Comptroller has the authority to levy taxes on the taxpayer's true and accurate federal taxable income, even if that amount differs from the figure that was accepted by the IRS. *Gannett Co.*, 356 Md. at 716, 741 A.2d 1130; *Winters*, 301 Md. at 236, 482 A.2d 886. A taxpayer should not, however, be "locked into" a federal taxable income figure even after a later determination by the IRS that the figure does not truly and accurately reflect the taxpayer's taxable income. A settlement agreement between a taxpayer and the IRS does not necessarily alter the taxpayer's legally required federal taxable income, and a compromise generally would not create an

income figure that is binding on Maryland. A closing agreement, on the other hand, can have the effect of altering a taxpayer's federal taxable income. When it does, as in the case before us, the taxable income figure established by the closing agreement is binding as the basis for Maryland income tax.

In our view, the Tax Court erred as a matter of law in finding that the closing agreements are merely representative of a settlement and do not establish Colonial's federal taxable income. Accordingly, we affirm the judgment of the circuit court. We need not consider Colonial's alternative argument.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**